

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-15-1994

# Ortiz, et al v. City of Phila., Comm. Voter Registration Div.

Precedential or Non-Precedential:

Docket 93-1634

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Ortiz, et al v. City of Phila., Comm. Voter Registration Div." (1994). *1994 Decisions*. Paper 49.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/49

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

----------

No. 93-1634

----------

ANGEL ORTIZ, a member of the
Philadelphia City Council, in
his individual capacity; PROJECT VOTE!;
SERVICE EMPLOYEES INTERNATIONAL UNION

v.

CITY OF PHILADELPHIA OFFICE OF THE CITY
COMMISSIONERS VOTER REGISTRATION DIVISION;
MARTHA JOHNSON, in her official capacity
as ADMINISTRATOR OF THE VOTER REGISTRATION
DIVISION OF THE CITY OF PHILADELPHIA

Angel Ortiz, Project Vote! and Service
Employees International Union,

<u>Appellants</u>

----------

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 91-06681)

----------

Argued January 20, 1994

BEFORE:  SCIRICA, LEWIS and GARTH, <u>Circuit</u> <u>Judges</u>

----------

(Opinion filed  June 15, 1994)

----------

Kenneth Kimerling
Arthur A. Baer (Argued)
Puerto Rican Legal Defense Fund
  and Education Fund, Inc.
99 Hudson Street, 14th Floor

1

New York, New York  10013

Attorneys for Appellants

Judith E. Harris, City Solicitor
Michael F. Eichert, Deputy City
  Solicitor

(Argued)

Office of City Solicitor
1600 Arch Street, 8th Floor
Philadelphia, Pennsylvania  19103

Attorneys for Appellees

----------

OPINION OF THE COURT

----------

GARTH, Circuit Judge:

Plaintiffs Angel Ortiz, Project Vote!, and Service Employees International Union (collectively "Ortiz") brought suit in the U.S. District Court for the Eastern District of Pennsylvania seeking to enjoin the City of Philadelphia ("City") from implementing Pennsylvania's non-voting purge law as violative of the Voting Rights Act of 1965.  The district court denied Ortiz's request for a permanent injunction and Ortiz appealed.  We have jurisdiction over Ortiz's appeal pursuant to 28 U.S.C. § 1291.  Finding no merit to Ortiz's legal arguments, we will affirm.

I

Pennsylvania law provides that registered voters who fail to vote for two years shall be purged from the registration rolls after being provided notice of the same.  25 Pa. Cons.

Stat. § 623-40.[0]  In the summer of 1991, approximately 21 percent

of Philadelphia's registered voters (193,000 voters) were slated

[0]        Section 623-40 provides as follows:

        During each year, the commission shall cause all of the district registers to be examined, and in the case of each registered elector who is not recorded as having voted at any election or primary during the two calendar years immediately preceding, the commission shall send to such elector by mail, at his address appearing upon his registration affidavit, a notice, setting forth that the records of the commission indicate that he has not voted during the two immediately preceding calendar years, and that his registration will be cancelled if he does not vote in the next primary or election or unless he shall, within ten days of the next primary or election, file with the commission, a written request for reinstatement of his registration, signed by him, setting forth his place of residence.  A list of the persons to whom such notices shall have been mailed shall be sent promptly to the city chairman of the political party of which the electors were registered as members.  At the expiration of the time specified in the notice, the commission shall cause the registration of such elector to be cancelled unless he has filed with the commission a signed request for reinstatement of his registration as above provided. The official registration application card of an elector who has registered may qualify as a reinstatement of his registration or a removal notice. The cancellation of the registration of any such elector for failure to vote during two immediately preceding calendar years shall not affect the right of any such elector to subsequently register in the manner provided by this act.

        Whenever the registration of an elector has been cancelled through error, such elector may petition the commission for reinstatement of his registration not later than the tenth day preceding any primary or election, and after a hearing on said application, if error on the part of the commission is proved, the commission shall reinstate the registration of such elector.

to be purged from Philadelphia's registration rolls for failing to vote.

On October 25, 1991, Ortiz filed an action alleging that the non-voting purge act had a disparate impact on minority voters and, thus, violates Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, the First and Fourteenth Amendments of the United States Constitution, and the Pennsylvania Election Law, 25 Pa. Cons. Stat. 623-40. Ortiz sought a judicial declaration that the purge violated the aforementioned provisions, as well as an injunction directing the City to restore all purged voters to the City's voter registration rolls, and enjoining the City from any further purging of non-voting, registered voters.

On October 29, 1991, the district court denied Ortiz's motion for a preliminary injunction. No appeal was taken. One month prior to the November 1992 elections, Ortiz again sought a temporary restraining order or preliminary injunction and an immediate hearing on the merits. This request was denied by order of the district court on October 6, 1992. Ortiz filed a petition for writ of mandamus (92-1821) and notices of appeal (92-1822 and 92-1839) from the district court's order, as well as a motion for injunction pending appeal, a motion for expedited appeal, and a motion for permanent injunction. We denied Ortiz's motions and petition for writ of mandamus on October 8 and 14, 1992. Ortiz's appeals were dismissed for failure to prosecute.

On November 10, 1992, a four-day trial was held to determine whether a permanent injunction should issue. On June

4

1, 1993, the district court granted judgment in favor of the City, denying Ortiz's requested relief. <u>Ortiz v. City of Philadelphia</u>, 824 F. Supp. 514 (E.D. Pa. 1993). After making extensive findings of fact, and recognizing that African-American and Latino voters are purged at disproportionately higher rates than their white counterparts, <u>id.</u> at 526-31,[0] the district court held that the purge law did not deprive minority voters of equal access to the political process in violation of Section 2. <u>Id.</u> at 539.

Ortiz appeals the denial of his Section 2 claim.[0]

II

Ortiz argues that the district court failed to apply the correct standard in concluding that he had failed to

---

[0] Ortiz's expert testified to the following disparities in the rates at which white and minority voters in the City of Philadelphia were slated to be purged, and estimated rates at which they actually were purged:

| Philadelphia Voters % Slated For Purging / Estimated Purge Rates | | |
|---|---|---|
| | Whites | African-American + Other |
| 1989 | 4.1% / 3.9% | 4.5% / 4.0% |
| 1990 | 8.5% / 7.9% | 11.7% / 11.1% |
| 1991 | 17.3% / 13.2% | 24.7% / 20.8% |
| 1992 | 6.4% / 6.4% | 6.6% / N/A |

[0] Ortiz has abandoned his claims under the United States Constitution and state law. In addition, we note that Ortiz's complaint was filed with respect to the 1991 election. Of course, both the purge preceding that election, and the election itself, have already occurred. Nevertheless, neither of the parties have argued that the issues presented on appeal are moot, nor could they so argue, inasmuch as Ortiz's complaint is "capable of repetition yet evading review." <u>Weinstein v. Bradford</u>, 423 U.S. 147 (1975).

5

demonstrate that the purge statute violated Section 2 of the Voting Rights Act. In particular, Ortiz asserts that the district court erred in finding that he had failed to prove that the purge statute caused minority voters to be removed from the voter-registration rolls at disparate rates.

## A.

A district court's conclusion that a challenged electoral practice has a discriminatory effect is a question of fact subject to review for clear error, Thornburg v. Gingles, 478 U.S. 30, 79 (1986) (recognizing that determination of whether or not political process is equally open to minority voters "is peculiarly dependent upon the facts of each case and requires an 'intensely local appraisal of the design and impact' of the contested electoral mechanisms"). The question of which standard (i.e., which individual factors) a district court should apply in determining whether, under the totality of the circumstances, a challenged electoral practice has a discriminatory effect, how-ever, presents a question of law subject to plenary review. Id. Accord Jenkins v. Red Clay Consolidated School District Board of Education, 4 F.3d 1103, 116-17 (3d Cir. 1993).

## B.

The Voting Rights Act of 1965 was enacted to enforce the Fifteenth Amendment of the United States Constitution, which provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any

6

State on account of race, color, or previous condition of servitude."

In 1982, Congress amended Section 2 of the Voting Rights Act "to make clear that certain practices and procedures that <u>result</u> in the denial or abridgement of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge." <u>Chisom v. Roemer</u>, ___ U.S. ___, 111 S.Ct. 2354, 2358 (1991) (holding that state judicial elections are included within the scope of Section 2 of the Voting Rights Act). That is, "Congress made clear that a violation of § 2 could be established by proof of discriminatory results alone." <u>Id.</u> at 2368.

As amended, Section 2 of the Voting Rights Act provided as follows:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
> (b) A violation of subsection (a) of this section is established if, <u>based on the totality of the circumstances</u>, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have <u>less opportunity</u> than other members of the electorate <u>to participate</u> in the political process <u>and</u> <u>to elect representatives</u> of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected

7

class elected in numbers equal to their proportion in the population.

(Emphasis added).

In Thornburg v. Gingles, 478 U.S. 30 (1986), a case which did not involve a purge act, black citizens of North Carolina brought suit challenging that state's legislative redistricting plan on the grounds that the plan impaired black citizens' ability to elect representatives of their choice in violation of Section 2 of the Voting Rights Act. The district court, applying the "totality of the circumstances" test set forth in § 2(b) of the Voting Rights Act, held that the redistricting plan violated the Act because it resulted in the dilution of black citizens' votes in all of the disputed election districts.

The Supreme Court affirmed the decision of the district court with respect to all of the disputed districts except one. In so ruling, the Court held that to determine "whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice,'" a court must "assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'" Thornburg, 478 U.S. at 44.

The Senate Judiciary Committee Report that accompanied the bill amending Section 2 enumerated a non-exclusive list of factors relevant to a Section 2 claim: the history of official voting-related discrimination in the State or political sub-

8

division; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used electoral practices that tend to enhance the opportunity for discrimination; whether minorities have been excluded from any candidate slating process; the extent to which minority groups bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; the extent to which political campaigns have been characterized by overt or subtle racial appeals; the extent to which minority members have been elected to public office; whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of minority groups; whether the policy underlying the use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.  S. Rep. No. 97-417, 97th Cong., 2d Sess. 28-30, reprinted in 1982 U.S.C.C.A.N. 177 ("S. Rep.").

Although in Thornburg v. Gingles the Supreme Court proceeded to weigh these factors, the Court also recognized that the Senate Judiciary Committee list was, in fact, "neither comprehensive nor exclusive," 478 U.S. at 45 (1986), and that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or another." Id., quoting S. Rep. at 29.  That is, both the Court and the Committee recognized that other factors might be relevant to the

9

determination of whether, under the totality of the circum-stances, a given electoral procedure was discriminatory.

On this much, the parties agree. Ortiz argues, despite the allegations in his complaint, that the district court completely negated the totality of the circumstances test set out by Section 2 in holding that if the purge statute was not "the dispositive force depriving minorities of equal access to the political process" then, under the "totality of the circumstances," there was no violation of the Voting Rights Act.[0]

The City argues that the district court did not err in requiring Ortiz to show that the purge statute caused minority voters to have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

C.

The primary legal issue before us, then, is whether the district court erred by factoring into its "totality of the circumstances" analysis the question of whether or not the purge statute caused minorities to be deprived of equal access to the political system.

---

[0] As we read the district court's opinion, we construe it to mean that where, as here, a Section 2 plaintiff seeks to abolish or invalidate a particular election practice, such as a purge law, and pinpoints the particular practice in its complaint, the plaintiff necessarily must demonstrate and establish by evidence that the particular practice causes the alleged discrimination.

1.

The Supreme Court wrote in Thornburg v. Gingles that "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." 478 U.S. at 47 (1986) (emphasis added). That is, the Supreme Court recognized that there must be some causal connection between the challenged electoral practice and the alleged discrimination that results in a denial or abridgement of the right to vote.

Three Courts of Appeal have required Section 2 plaintiffs to demonstrate a causal connection between asserted indicia of discrimination and the challenged electoral procedure at issue. In Wesley v. Collins, 791 F.2d 1255 (6th Cir. 1986), the plaintiffs argued that a Tennessee law which disenfranchised convicted felons had a disproportionate impact on blacks because a significantly higher number of black Tennesseeans are convicted of felonies than whites. The Court of Appeals rejected this argument, despite the district court's findings that there existed in Tennessee "a history of racial discrimination, the effects of which continue to the present day." Id. at 1261. The court held that, under the totality of the circumstances, the presence of some of the factors enumerated in the legislative history of Section 2 was outweighed by other factors such as the state's legitimate and compelling rationale for enacting the statute at issue. The court concluded that "the disproportionate

11

impact suffered by black Tennesseeans does not 'result' from the state's qualification of the right to vote on account of race or color and thus the Tennessee Act does not violate the Voting Rights Act."  Id. at 1262.

In Irby v. Virginia State Board of Elections, 889 F.2d 1352, 1358-59 (4th Cir. 1989), the Fourth Circuit upheld a district court's finding that Virginia's appointive system for selection of school board members did not violate Section 2 of the Voting Rights Act.  That is, the Court of Appeals agreed with the district court's conclusion that, despite the existence of a "significant disparity" between the percentage of blacks in the population and the percentage of blacks on the school board, "[t]he evidence cast considerable doubt on the existence of a causal link between the appointive system and black underrepresentation in Buckingham and Halifax counties."  Id. at 1359.  Rather, the disparity arose from the fact that "although blacks comprise a large portion of the population, they are not seeking school board seats in numbers consistent with their percentage of the population."  Id. at 1358, quoting, 693 F. Supp. 424, 434 (E.D. Va. 1988).

Finally, in Salas v. Southwest Texas Junior College District, 964 F.2d 1542 (5th Cir. 1992), Hispanic voters challenged the use of an at-large system, as opposed to single member districts.  The Fifth Circuit held that "the district court's ultimate finding that the cause of Hispanic voters' lack of electoral success is failure to take advantage of political opportunity, rather than a violation of § 2," was not clearly

12

erroneous.  <u>Id.</u> at 1556.[0]  Noting that evidence introduced at trial showed that Hispanic voter turnout was roughly seven percentage points below that of Anglo-Saxon whites, the Court of Appeals agreed that "[o]bviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote."  <u>Id.</u>[0]

---

[0]     The dissent's attempt to distinguish <u>Salas</u> misses the mark.  See Dissent typescript at 28.  Although the Court of Appeals in <u>Salas</u> did address the issue of whether or not a minority group which constitutes a majority of registered voters may bring a claim under Section 2 of the Voting Rights Act, concluding that it could, the court proceeded to consider the validity of the plaintiffs' claim on the merits, and stressed the need for the plaintiffs to establish that the challenged practice (i.e., the at-large system) caused the electoral dilution.
        After delineating the court's responsibility to analyze the impact of a challenged practice, and the plaintiffs' burden to prove that the practice denied them the opportunity to elect their preferred representatives, the Fifth Circuit noted that "[u]nderlying these functions of the court and the plaintiffs in a multimember district vote dilution case is an inquiry into causation--whether the given electoral practice is responsible for plaintiffs' inability to elect their preferred representatives."  964 F.2d at 1554 (5th Cir. 1992).
[0]     We note that the legislative history of the 1982 amendment also supports this construction of Section 2.  For example, the Senate Judiciary Committee Report summarized the amendment's effect as follows:

> If <u>as a result of the challenged practice or structure</u> plaintiffs do not have an equal opportunity to participate in the political process and to elect candidates of their choice, there is a violation of this section.

Sen R. at 28 (emphasis added).  We read this language to provide that Congress intended that any alleged denial of equal access to the political process be the "result of the challenged practice or structure."
        The Report also stresses that the ultimate test for both permanent structural barriers to political participation, as well as episodic barriers, would be the standard enunciated by the Supreme Court in <u>White v. Regester</u>, 412 U.S. 755 (1973), and codified by Congress in its 1982 amendment of Section 2:

13

2.

We agree that Section 2 plaintiffs must show a causal connection between the challenged voting practice and the prohibited discriminatory result.  Ortiz's argument to the contrary is without legal foundation, devoid of endorsement in existing caselaw and the legislative history of Section 2 of the Voting Rights Act, and is not supported by evidence.  In the present case, the district court properly considered whether or not Pennsylvania's non-voting purge statute[0] caused the discrimination of which Ortiz complained.

III

A.

---

"whether, in the particular situation, the practice operated to deny the minority plaintiff an equal opportunity to participate and to elect candidates of their choice."  Sen. R. at 30 (emphasis added) (accompanying footnote discussed below).  This language informs us that the Senate Judiciary Committee expected that courts ultimately would focus on the challenged procedure and its causal effects on equal opportunity to participate in the political process.

Finally, the footnote accompanying the above-quoted text states that "purging of voters could produce a discriminatory result if fair procedures were not followed, Toney v. White, 488 F.2d 310 (5th Cir. 1973), or if the need for a purge were not shown or if opportunities for re-registration were unduly limited."  S. Rep. at 30 n. 119.  Thus, the Committee acknowledged that a purge statute which, itself, produced a discriminatory result, by virtue of the manner in which it was administered, might violate Section 2 of the Voting Rights Act. Implicitly, however, the Committee recognized that a purge statute which was administered fairly, and in an even-handed manner, would not run afoul of the law.

[0] See, supra, note 1.

14

Ortiz argues that the district court erred in holding that, under the totality of the circumstances, Ortiz had "failed to demonstrate that the purge law interacts with social and historical conditions to deny minority voters equal access to the political process and to elect their preferred representatives." Ortiz, 824 F. Supp. at 539 (E.D. Pa. 1993).[0] As previously observed, the ultimate question of whether a challenged electoral procedure has a discriminatory effect is a question of fact which we review for clear error. See, supra, Section II(A).

The district court made extensive findings with respect to the aforementioned objective factors delineated in the Senate Judiciary Committee Report. The district court found that there was racially polarized voting in Philadelphia, Ortiz, 824 F. Supp. at 532-33, and a "general pattern" of racial appeals in some Philadelphia political campaigns. Id. at 536-37. The court found that there were "substantial socioeconomic disparities among African-American, Latino and white residents of the City of

---

[0]     Ortiz challenges a number of the district court's underlying factual findings. In particular, Ortiz argues that the district court erred in finding that the City's failure to send out bilingual "intent to purge" notices, in violation of an order in Arroyo v. Tucker, 372 F. Supp. 764 (E.D. Pa. 1974), did not have a discriminatory impact on the ability of Latino voters to equally participate in the political process. Ortiz also claims that the district court erred in finding that minority voters did not suffer a disproportionate burden of re-registration, and that the disproportionate placement of older voting machines in minority wards did not have a discriminatory impact on minority voters.

None of these findings of fact were clearly erroneous. In any event, they are subsumed by the district court's ultimate factual determination that Ortiz had failed to establish that the purge statute caused minority voters to be purged at a disproportionate rate.

15

Philadelphia, which affect the ability of these minority groups to participate in the political process and to elect their candidates of choice." Id. at 535.[0] In addition, the court found that the needs of minority citizens have not always been adequately addressed by city officials, and that this factor, as well as the impact of various socioeconomic factors, could influence minority participation in the political process. Id. at 538.

Nevertheless, the district court found that there was no evidence of historical voting-related discrimination infringing upon the rights of Latinos or African-Americans to vote. Id. at 531-32. There was no evidence of discrimination in the candidate slating process that denied minority candidates equal access to the political process. Id. at 533. Nor was there evidence that minorities experience difficulty in electing representatives of their choice. Id. at 537-38.[0]

Finally, the district court found that the policy reasons underlying the City's implementation of the voter purge were substantial and were based upon a valid state interest of

_____

[0]     In particular, the district court found disparities in the rates of educational attainment, home ownership, housing discrimination, health care coverage, employment, and income among African-Americans and Latinos in comparison to the general population of the City of Philadelphia. The court also found that minority voters in Philadelphia do not exercise their right to vote to the same extent as white voters, which in part may be attributable to discrimination and the overall socioeconomic status of minorities in Philadelphia. Ortiz, 824 F. Supp. at 533-35.

[0]     See, infra, note 16, and accompanying text.

16

ensuring that elections in Philadelphia are not plagued with fraud. <u>Id.</u> at 538–39.

Ultimately, the district court concluded that Ortiz had failed to establish a <u>per se</u> violation of Section 2:

> Plaintiffs have failed to demonstrate that the purge law interacts with social and historical conditions to deny minority voters equal access to the political process and to elect their preferred representatives, particularly since it is undisputed that the purge procedure is administered fairly and that there is ample opportunity for purged voters to re-register to vote. Although it is clear that the operation of the purge law removes African-American and Latino voters from the voter registration rolls at higher rates than white voters, this disproportionate impact does not rise to the level of a <u>per se</u> violation of § 2, even when considered in light of the court's findings of the existence of racially polarized voting, socioeconomic disparities in education, employment and health, racial appeals in some elections, and the failure of the City in some instances to address the needs of minority citizens. While it is clear that these factors may contribute to decreased minority political participation rates, plaintiffs' evidence simply does not justify the conclusion that the purge law is the dispositive force in depriving minority voters of equal access to the political process in violation of § 2.

<u>Ortiz</u>, 824 F. Supp. at 539.[0]


B.

We hold that the district court did not err in concluding that Ortiz had failed to show that Philadelphia's minority population has had less opportunity than other members of the electorate to participate in the political process and to

---

[0] Examining the district court's opinion as a whole, it is apparent that the court's use of the phrase "the dispositive force" means a cause which, in that context, would be legally dispositive.

17

elect representatives of their choice, as a result of Pennsylvania's purge statute.

The Supreme Court has stated categorically that the right to vote is of the very essence of democratic society. <u>Shaw v. Reno</u>, ___ U.S. ___, 113 S.Ct. 2816, 2822 (1993), <u>quoting</u> <u>Reynolds v. Sims</u>, 377 U.S. 533, 555 (1964). Although we are mindful of the fact that it was not until relatively late in our nation's history that this right was extended to every American citizen, without regard to race, we note that the Fifteenth Amendment, the Voting Rights Act, and numerous judicial decisions all have sought to raze any enduring historical bastions of state-administered voter discrimination.

Here, however, it is not the State which prevents citizens from exercising their right to vote, from participating in the political process, and from electing representatives of their own choosing. We are not confronted with an electoral device -- such as "race-neutral" literacy tests, grandfather clauses, good-character provisos, racial gerrymandering, and vote dilution -- which discriminates against minorities, which has no rational basis, and which is beyond the control of minority voters. Rather, we are faced with the fact that, for a variety of historical reasons, minority citizens have turned out to vote at a statistically lower rate than white voters.[0]

---

[0] The following statistics, upon which the district court relied, <u>Ortiz</u>, 824 F. Supp. at 536 (E.D. Pa. 1993), are illuminative:

| Voter Registration and Voter Turnout in General Elections by Year and Ethnicity | | | |
|---|---|---|---|
| | Eligible Voters | Actual Voters | Percentage |

18

As we read Ortiz's complaint, the entire document is drawn to allege that Pennsylvania's purge statute "caused" the disparate purge rates between Philadelphia's white and minority communities.  Yet, there is nothing before us, not even one iota of evidence introduced at trial or present in the record, which would establish that fact, despite the claims made by the dissent.

On the contrary, it is well established that purge statutes are a legitimate means by which the State can attempt to prevent voter fraud.[0]  More importantly, registered voters are

| Year | White | Black | Other | White | Black | Other | White | Black | Other |
|---|---|---|---|---|---|---|---|---|---|
| 1987 | 529,863 | 370,768 | 56,143 | 369,763 | 249,141 | 27,888 | 69.7 | 67.2 | 48.6 |
| 1988 | 540,397 | 384,712 | 74,897 | 390,965 | 238,752 | 40,424 | 72.5 | 62.1 | 54.2 |
| 1989 | 515,984 | 369,733 | 77,751 | 233,606 | 112,730 | 10,267 | 45.3 | 30.5 | 20.8 |
| 1990 | 464,350 | 321,417 | 88,653 | 252,221 | 120,349 | 27,079 | 54.3 | 37.4 | 30.5 |
| 1991 | 408,143 | 267,172 | 120,642 | 155,987 | 155,987 | 53,936 | 67.2 | 58.3 | 44.7 |

[0]     For example, the Fourth Circuit stated as follows in rejecting a constitutional challenge to Maryland's voter purge statute:

> The statute in question here is designed to curb vote fraud.  It removes from the registered voter list those who have moved without notifying the voter registration board, those who have died when the city has not been notified of such deaths, and those who have become disqualified as a result of conviction for infamous crime if the city did not receive notice of such convictions.  Without removing the names, there exists the very real danger that impostors will claim to be someone on the list and vote in their places. And the absent voting statutes open the door for vote fraud by this means.  Accordingly, keeping accurate, reliable and up-to-date voter registration lists is an important state interest. . . . Even considering that

purged -- without regard to race, color, creed, gender, sexual orientation, political belief, or socioeconomic status -- because they do not vote, and do not take the opportunity of voting in the next election or requesting reinstatement.[0]

It is true that in certain years minority voters have turned out in proportionately lower numbers than have non-minority voters. But the purge statute did not cause the statistical disparities which form the basis of Ortiz's complaint. We agree with the Fifth Circuit that "a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote." Salas v. Southwest Texas Junior College District, 964 F.2d 1542, 1556 (5th Cir. 1992).

C.

---

re-registration may be somewhat burdensome, it is a small price to pay for the prevention of vote fraud.

Hoffman v. Maryland, 928 F.2d 646, 649 (4th Cir. 1991). See also Rosario v. Rockefeller, 410 U.S. 752, 761 (1973) (recognizing that "preservation of the integrity of the electoral process is a legitimate and valid state goal"); Barilla v. Ervin, 886 F.2d 1514, 1523-24 (9th Cir. 1989) (recognizing legitimate state interest in preventing electoral fraud). See, infra, discussion at 27-30.

[0] We note that the procedures for re-registering to vote are identical to those for registering in the first place; therefore, they are no more complicated, burdensome, or discriminatory than the requirement of initial registration. See Williams v. Osser, 350 F. Supp. 646, 653 (E.D. Pa. 1972) (recognizing that "[t]he burden [of re-registration under the non-voting purge law] does not nearly approach the requirements of initial registration.")

Section 2 of the Voting Rights Act requires minority claimants to prove that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Chisom v. Roemer, ___ U.S. ___, 111 S. Ct. 2354, 2365 (1991). That is, Section 2 plaintiffs must demonstrate that they had less opportunity both (1) to participate in the political process, and (2) to elect representatives of their choice. In Chisom, the Supreme Court stated:

> Any abridgement of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election. . . . [H]owever, the inability to elect representatives of their choice is not sufficient to establish a violation unless, under the totality of the circumstances, it can also be said that the members of the protected class have less opportunity to participate in the political process.

111 S. Ct. at 2365 (holding that state judicial elections fall within the scope of Voting Rights Act).

In contrast to the situation discussed by the Court in Chisom, here the district court not only made a finding of minority participation in the political process, Ortiz, 824 F. Supp. at 539, but it also made an explicit finding of fact that Philadelphia's minority population has not had difficulty electing minority representatives. Id. at 537–38. In fact, despite the dissent's charges, there is no evidence in the record that minorities have been denied fair access to the political process in the City of Philadelphia, nor is there any evidence that the purge law "impairs their ability to influence the

21

outcome of an election." Chisom, 111 S.Ct. at 2365.[0]  To the
contrary, a minority candidate, Wilson Goode, had won election to
two four-year terms as Mayor of the City of Philadelphia, in 1983
and 1987, and the district court found that the Philadelphia City
Council consistently has had a strong minority presence,
including seven of the seventeen council seats at the time the
district court issued its opinion.[0]

[0]    The dissent quotes footnote 117 from the Senate
Judiciary Committee Report as follows: "[E]ven a consistently
applied practice premised on a racially neutral policy would not
negate a plaintiff's showing through other factors that the
challenged practice denies minorities fair access to the
process."  Dissent typescript at 35.  Ortiz, however, has failed
to prove that "the challenged practice [i.e., the purge statute]
denies minorities fair access to the process."

[0]    The district court included in its opinion the
following germane statistics with respect to minority
representation in the Pennsylvania legislature:

| Representatives from Philadelphia in the State House and Senate by percentage of minorities represented | | | | | | |
|---|---|---|---|---|---|---|
| | House | | | Senate | | |
| Year | Total | Minority | % | Total | Minority | % |
| 1979 | 34 | 10 | 29% | 8 | 3 | 32% |
| 1980 | 34 | 11 | 32% | - | - | - |
| 1982 | 29 | 12 | 41% | 7 | 3 | 42% |
| 1985 | 29 | 13 | 44% | 7 | 3 | 42% |
| 1986 | 29 | 13 | 44% | - | - | - |
| 1988 | 29 | 13 | 44% | - | - | - |
| 1990 | 29 | 13 | 44% | - | - | - |
| 1992 | 27 | 13 | 44% | 7 | 3 | 42% |

22

These findings by the district court are not clearly erroneous.  Thus, we conclude that Ortiz, in failing to establish causation, has also failed to satisfy both elements of a Section 2 cause of action and, accordingly, has failed to establish a basis upon which his requested relief could be granted.

IV

The dissent argues at great length that societal conditions -- discrimination in housing, education, wages, etc. -- constitute a totality of the circumstances with which the practice (the purge law) interacts to create inequality (discrimination).  The dissent, however, has overlooked the fact that the individuals to whom the purge law applies apparently have surmounted and overcome the societal disadvantages which it emphasizes, and have registered to vote at least once, if not more often.[0]  Had they continued to do so, the purge law could not have affected them, inasmuch as the purge law operates against only those who have registered to vote at least once, but then do not vote or register again.  Conversely, if individuals have never registered and have never voted, the purge law still

---

[0]    Thus, the dissent's reliance on Mississippi State Chapter, Operation Push v. Allain, 674 F. Supp. 1245 (N.D. Miss. 1987), aff'd, 932 F.2d 400 (5th Cir. 1991), is misplaced.  See dissent typescript at 23-25.  In that case, Mississippi's onerous dual registration requirement, and prohibition on off-site voter registration, were the causes of black voters' registering at lower rates than white voters.  In the present case, no part of the purge statute prevents minority voters from registering to vote and from actually voting.  In fact, as mentioned in text, the statute only applies to those voters who already have registered to vote.

could not be applied to them because, as stated, the purge law affects only those who have once registered to vote.

Once having registered to vote, such individuals could not have been impeded by the practices which Ortiz claims have diluted their participation in the voting process.[0]  This may very well account for the fact that no reported case has ever dealt with a non-voting purge law as a racially discriminatory instrument in violation of Section 2 of the Voting Rights Act, and the dissent, accordingly, has been unable to cite any such authority.  It certainly accounts for the result which the district court reached in the present case, and which we reach today.  The societal disadvantages cited by the plaintiffs and the dissent just are not relevant.  They are not relevant because they could not have diluted voting by a registrant or voter who had already registered and/or voted.  As previously stated, the record reveals no link between the societal conditions and factors recited by the dissent and the electoral practice (i.e., the purge law) challenged by Ortiz.

In addition, the dissent argues at length that "the City did not prove 'the need' for Pennsylvania's non-voting purge law," (Dissent typescript at 33), and that the City properly should have been required to do so.  The dissent derives such a requirement from footnote 119 in the Senate Judiciary Committee's Report,[0] and its own analogy to Title VII disparate impact law.[0]

---

[0]    See, supra, note 14.

[0]    Footnote 119 provides in relevant part as follows: "purging of voters could produce a discriminatory result if fair procedures were not followed, Toney v. White, 488 F.2d 310 (5th

24

However, no relevant authority has been cited for imposing such a burden upon the City.[0]  Even if there were such a requirement, we are satisfied that a review of the record and present reality demonstrates that the City's purge statute meets an important and

---

Cir. 1973), or if the need for a purge were not shown or if opportunities for re-registration were unduly limited." (Emphasis added.)  In the present case, none of these qualifications are relevant, nor has Ortiz proved the presence of any of them.

[0]    In Title VII disparate impact cases, plaintiffs are permitted to come forward with evidence of less discriminatory alternatives to refute their employers' business justifications because such evidence "would belie a claim by [employers] that their incumbent practices are being employed for non-discriminatory reasons." Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 660-61 (1989) (recognizing that employer's practice need not be "essential" or "indispensable" to the employer's business for it to pass muster as a business justification). Here, there is no allegation, no implication, no imputation, and, of greatest importance, no evidence, that the purge statute was enacted, or is being employed, by the City of Philadelphia for anything but nondiscriminatory reasons.

    Moreover, even if the dissent was correct in drawing an analogy to Title VII jurisprudence -- an analogy which is inapposite -- we note that in Title VII cases, it is the plaintiff, not the defendant, as the dissent would have it, see Dissent typescript at 43, who, at all times, bears the burden of proving discrimination.  St. Mary's Honor Center v. Hicks, ___ U.S. ___, 113 S. Ct. 2742, 2749 (1993); Dothard v. Rawlinson, 433 U.S. 321 (1977); Newark Branch, NAACP v. Town of Harrison, 940 F.2d 792, 798 (3d Cir. 1991).  In the present case, Ortiz has failed to carry any such burden.

[0]    In Wesley v. Collins, 791 F.2d 1255, 1261 (6th Cir. 1986), the Sixth Circuit did not require the State of Tennessee to show that its statute disenfranchising convicted felons was "necessary."  Nor could the State have made such a showing were it required to do so.  Rather, the Court of Appeals held:

> [T]he existence of other social and political factors present in this case leads to the inescapable conclusion that the Voting Rights Act was not violated.  Chief among those factors was the state's legitimate and compelling rationale for enacting the statute here in issue.

Id. at 1261.

legitimate civic interest and is needed to prevent electoral fraud.

Notably, and of recent date, Philadelphia's Senate election, in which the Democratic candidate ostensibly had prevailed, was invalidated on the basis of findings that absentee votes cast by non-residents and deceased voters had been fraudulently obtained and counted.  See Marks v. Stinson, No. 93-6157 (E.D. Pa. Feb. 18, 1994), vacated in part, 19 F.3d 873 (3d Cir. 1994).  Indeed, as recently as April 13, 1994, the Philadelphia Inquirer reported under the headline, "City Purging 2d District Voter Rolls," that at least twenty-two individuals were "purged" because they either had died or no longer lived in the district but had, nevertheless, cast votes in the most recent election -- the very fraudulent acts which the purge statute was designed to overcome.[0]  Even the dissent acknowledges that

---

[0]        That article recited in part:

> · The Board of Elections has begun purging the Second Senate District voting rolls of people who no longer live there -- including a woman whose vote was recorded after she died and another whose vote was cast while she lived on a Greek island.
>
> · Election officials said the 22 names -- including an individual who city investigators found living in New Jersey -- would immediately be purged from computerized voting rolls and notification would be delivered to the addresses on their voter registration.
>
> · Among the 22 people being purged in the Sixth Division of the 42d Ward is one individual who has been living in Las Vegas for two years, though a vote was cast in her

electoral fraud has been a part of Philadelphia's landscape for over 100 years.  See Dissent typescript at 39 n.22.

V

In its final analysis, the dissent's rhetoric still fails to bridge the gap between the societal disadvantages which it catalogues at great length, and the purpose and effect of Philadelphia's non-voting purge act.  Once again, we emphasize that the sole purpose of that act is to prevent the very electoral fraud which can diminish the voting power of all citizens who have registered and voted, including registered and voting members of minority groups.  Despite the dissent's attempt to attribute society's voting ills to the purge act, neither the plaintiffs nor the dissent have been able to demonstrate that the purge act has had any effect whatsoever on any rights which are protected by Section 2 of the Voting Rights Act.

The dissent repeatedly charges the purge act with discrimination against minorities.  See, e.g., Dissent typescript at 7, 47, 50.  Yet, not one word appears in the dissent to

---

name in the November election without her knowledge, and a second individual who said he did not vote in any of the five Philadelphia elections in which ballots were cast for him since 1988.

· Between 1988 and 1993, for example, at least 60 improper ballots were cast in the Sixth Division of the 42d Ward, 27 by machine and 33 by absentee ballot.

Mark Fazlollah, City Purging 2d District Voter Rolls, Phila. Inquirer, April 13, 1994, at A1, A7.

27

substantiate such charges. Of even greater importance, the entire record is devoid of evidence which could support such a conclusion. It is not enough, in an attack on a non-voting purge law, simply to express distress over the very real societal disadvantages that afflict some members of minority groups. Such sympathy and concern, though shared by all of us, are extraneous to the legal challenge mounted by Ortiz.

The dissent's single-minded focus on societal disadvantages might be entitled to somewhat greater weight in a suit challenging, not Philadelphia's purge act, but, perhaps, more generally, Philadelphia's voter registration procedures themselves. It is apparent to us that the dissent, while charging the purge act with a discriminatory effect, essentially is railing against registration procedures not at issue here.

For example, if Ortiz had alleged that, because of disadvantages in education, housing, health, income, and the like, minority citizens could not afford to travel to registration centers, or in some other way avail themselves of registration opportunities, the dissent's essay might have some meaning. But Philadelphia's voter registration laws, as a whole, are not under attack here. The sole statute assailed by Ortiz is § 623-40, the non-voting purge act. That act operates only after a would-be registrant has overcome whatever societal obstacles, such as those detailed in the dissent, were in his path.

When, if ever, a claimant mounts an attack against Philadelphia's voter registration provisions, then and only then will it be the time to assess the legality of such procedures in

28

light of the societal disadvantages highlighted by the dissent. This case, this appeal, and our opinion, however, are not the time or place for such a discussion. Until proofs can be assembled -- and we can think of none that are relevant -- to establish that a benign and neutral non-voting purge law discriminates against a particular class, we decline to invalidate such a statute.

VI

We hold that the district court did not err in denying Ortiz's request for declaratory and permanent injunctive relief. Therefore, we will affirm the district court's June 1, 1993 order granting judgment in favor of the City.

Costs will be taxed against the appellant, Ortiz.

<u>Ortiz v. City of Philadelphia</u>, No. 93-1634


SCIRICA, <u>Circuit</u> <u>Judge</u>, concurring.


Nothing undermines democratic government more quickly than fraudulent ele

Any practice that impairs a fair process or rigs the count devalues and dilutes the

of each citizen, including each minority citizen, who has lawfully voted. Voter fra

including the practice of voting dead or non-resident citizens, is no stranger to

Pennsylvania, especially to the City of Philadelphia.  In 1937, the Pennsylvania Ge

Assembly made a judgment that a non-voting purge law was necessary to prevent voter

25 Pa. Stat. Ann. § 623-40 (1963 & 1993 Supp.).  Thirty-five years later, a three j

federal court upheld the constitutionality of Pennsylvania's law, based on the vali

interest in protecting the integrity of the electoral process.  <u>Williams v. Osser</u>,

F.Supp. 646 (1972).[0]  The court held that was a policy decision the General Assembl

---

[0] As Judge Max Rosenn stated:

> The principal state interest which the statute protects is the prevention
> of fraudulent voting. Maintaining voter rolls that include persons who no long
> reside in a precinct, or who reside there but do not vote, conduces to fraud.
> Pennsylvania discovered that political operatives knowledgeable of the status
> such registrants and weaknesses in the system were able to cast votes in the
> non-voters' names.  The two-year period allows removal of the names before the
> political operatives can take advantage of the situation.  If the period were
> four years instead of two, they would have greater opportunity to seize upon t
> registrant's non-voting status and defeat the purpose of the purge.  Such
> considerations led the state legislature to change the purge period from four
> two years in 1941 after considerable public concern over voting fraud.  Mr.
> Welsh testified that the change was prompted by a suit instituted in 1940 by t
> Committee of Seventy, charging fraud by "phantom voters."

1

entitled to make.  In this statutory challenge, as set forth in the court's opinion

plaintiffs in this case  failed to prove the Pennsylvania law violated Section 2 of

Voting Rights Act of 1965, as amended, 42 U.S.C. § 1971-73 (1988 & 1992 Supp.), in

minority citizens "have less opportunity than other members of the electorate to

participate in the political process and to elect representatives of their choice."

is significant is that the concerns that led to the passage of the Pennsylvania law

alive; as Judge Garth has noted, fraudulent voting in Philadelphia remains egregiou

flagrant today.

For some time now, Congress and the state legislatures, concerned by low

rates, have commendably sought to increase voter participation.  Last year, citing

steady decline of citizen participation in federal elections (except for 1992) and

penalty imposed on non-voters by removing their names from the rolls,[0] Congress dec

promote voter registration by passing the National Voter Registration Act, 42 U.S.C

§1973gg (1994 Supp.).[0]  In the process, Congress sought to strike a balance between

---

Williams v. Osser, 350 F. Supp. 646, 652 (1972) (citation omitted) (footnote omitte
Footnote 10, following this passage, stated:

> The court takes judicial notice that on April 8, 1941, a Special Federal Grand
> Jury presentment found that there were 50,000 ineligible voters on the
> Philadelphia registrations lists.  Of course, voting fraud was not a new probl
> at the time the two-year purge was enacted.

Id. n.10 (citations omitted).

[0]H.R. Rep. No. 9, 103rd Cong., 1st Sess. (1993), reprinted in 1993 U.S.C.C.A.N. 105
S. Rep. No. 6, 103rd Cong. 1st Sess. 17 (1993).
[0]It appears the Act, which applies to all federal elections, will take effect in
Pennsylvania January 1, 1995.

2

facilitating registration and preventing fraudulent voting,[0] but in the overall sch
appears the new Act will make it more difficult for the states to cull out ineligib
voters and remove them from the rolls.[0]

Like the policy decision made by the Pennsylvania legislature to deter el
fraud, the new Act represents a policy choice by Congress to promote registration a
voter participation.  Absent practices that violate other statutes or the Constitut
such as unlawful discrimination, it is for the legislature to strike the balance he

---

[0]Congress stated the purposes of the Act as follows:

> The purposes of this subchapter are--
>     (1) to establish procedures that will increase the number of eligible cit
> who register to vote in elections for Federal office;
>     (2) to make it possible for Federal, State, and local governments to impl
> this subchapter in a manner that enhances the participation of eligible citi
> voters in elections for Federal office;
>     (3) to protect the integrity of the electoral process; and
>     (4) to ensure that accurate and current voter registration rolls are mai

42 U.S.C.A. § 1973gg(b).

[0]Under the National Voter Registration Act, persons cannot become ineligible simply
failing to vote.  While directing states to make reasonable efforts to prevent frau
Act provides that any such state program or activity "shall not result in the remov
the name of any person from the official list of voters registered to vote in an el
for Federal office by reason of the person's failure to vote."  42 U.S.C.A. §1973gg
6(b)(2).

Angel Ortiz, et al. v. City of Philadelphia Office of the City Commissioners Voter
Registration, et al.
No. 93-1634


LEWIS, Circuit Judge, dissenting.

Assuredly, much progress has been made since the enactment of the Voting
Act in 1965.  But in spite of the contributions the majority quite properly credits
eradicating many of the most glaring forms of discrimination in voting, the law has
ensure that members of minority groups will have an equal opportunity to participat
the political process.  We cannot pretend, and I do not read the majority opinion t
suggest, that the discrimination prohibited by the Voting Rights Act has been releg
an unfortunate but closed chapter of American history.  Discrimination and its effe
remain a part of our present reality.  If we deny the continued existence of this p
we not only lose our ability to recognize and remedy present instances of unlawful
inequality; we also guarantee that discrimination and the damage it does to the int
and effectiveness of democratic government will be a more prevalent and intractable
feature of our country's future.

The majority and I share these broader concerns, but I have a different
understanding of the way in which they are implicated in this case.  In my view, th
district court erred in concluding that Pennsylvania's non-voting purge statute doe
violate § 2 of the Voting Rights Act.  Moreover, the purge statute serves as a clea
reminder that the law has yet to eliminate discrimination and its enduring effects
area of voting.  For these reasons, I dissent.

4

Because of my deep concerns about the impact that I fear today's decision

have, both on the residents of Philadelphia who will not be able to exercise their

to vote in upcoming elections, and on future efforts to properly apply the Voting R

Act, I have set forth my views at considerable length.

## I.

Early every January, in keeping with Pennsylvania's non-voting purge law,

Voter Registration Division of Philadelphia's City Commissioners Office determines

registered voters have voted during the previous two calendar years.  Those who hav

done so are slated for purging.  After identifying these voters, the City sends the

"intent to purge notices."  The notices, which are printed only in English, state:

> NOTICE OF FAILURE TO VOTE WITHIN TWO YEARS  Our Records indicate you
> have failed to vote for the last two years.  As required by law, we
> will cancel your Registration, unless you vote in the next Primary or
> Election or File with this Commission a written request for
> Reinstatement (10) ten days prior to the next Primary or Election,
> signed by you, giving your present residence.  This is the only notice
> you will receive.

Appendix ("A.") at 362.  The address of the Voter Registration Division appears on

notices beneath this statement.[0]  The notices do not, however, provide any instruct

to how an individual might "File with this Commission a written request for

Reinstatement," nor do they contain any information regarding what such a "request

Reinstatement" must contain (other than a signature and address).

---

[0]Additionally, in smaller type and without any explanation, "MU6-1500" appears in t
upper left corner of the notices, and "MU6-1501" appears in the upper rig
corner.  At trial, Robert Lee, the Director of the Voter Registration Div
testified that those markings represent the Division's phone numbers. Ac
to Lee, that was "obvious."  A. at 283.  Lee further testified that his o
did receive calls from registered voters who asked for explanations of in
to-purge notices that they had received.  A. at 286.

Voters who are sent an intent to purge notice and who fail either to vote [in the] upcoming spring primary or to file a written request for reinstatement are purged f[rom the] registration rolls. Once purged, an individual must re-register in order to vote i[n the] future.

The non-voting purge has a substantially disparate impact on black and La[tino] Philadelphians. The uncontroverted statistical evidence presented at trial, which [the] district court credited, showed that each year, greater percentages of black and La[tino] voters were slated for purging than were white voters. The evidence further showed [that] white voters were reinstated at higher rates than blacks and Latinos, thus increasi[ng the] adverse disparate impact on these minority groups as a result of the non-voting pur[ge.] at 32-35.

The differences between the way this challenged voting practice affected [Latinos] and blacks, as compared to the way it affected whites, were substantial and consist[ent.] According to the plaintiffs' expert, Dr. Alan Lichtman, the statistical data showed [that] Pennsylvania's non-voting purge created a "clear and consistent pattern" of systema[tically] purging black and Latino voters at significantly greater rates than whites. See, e[.g.,] at 38-39 (testimony of Dr. Lichtman, describing the differences as far exceeding th[e] standards of statistical significance, and as reflecting "systematic" results of th[e] process); A. at 385, 394-95 (declaration of Dr. Lichtman, stating: "The disparate i[mpact] on minorities of Philadelphia's non-voting purge is both substantial and systematic[,] extending through a full four-year electoral cycle."). Dr. Lichtman's expert analy[sis of] the registration and purging statistics was uncontroverted and scientifically sound[. The] district court, relying on his trial testimony and declaration, found that the expe[rt]

6

evidence "clearly reveals that African-American and Latino voters are slated for pu[rging]

at higher rates than their white counterparts, and further, that minorities are pur[ged at]

higher rates than white registrants." Ortiz v. City of Philadelphia, 824 F. Supp.

530 (E.D. Pa. 1993). "This finding," the court stated, "is not limited by the fact [that]

there were fluctuations in the purge rate from year to year." Id.[0]

The district court made a number of other factual findings, which the maj[ority]

accurately recounts. Particularly significant among those, for reasons I discuss b[elow,]

the court found that Latino and black Philadelphians have suffered significant

disadvantages in education, employment, housing, health care, and income.[0] These

"substantial socioeconomic disparities among African-American, Latino, and white re[gistrants]

---

[0] In his declaration, based on the statistics that appear in the district court [and]
majority opinions, Dr. Lichtman explained: "To put this [disparate impact [of the]
non-voting purge] into perspective, if the black [purge] rate in 1991 had [been]
as low as the white rate, about 28,000 fewer black registrants would have [been]
[slated for purging] in 1991. Conversely, if the white purge rate in 199[1 had]
been as high as the black rate, about 41,000 more white registrants would [have]
been [slated for purging] in 1991." A. at 386.

The 1991 purge was the largest of the four years studied, as it affected all
registrants who had not voted since the 1988 presidential election. About 21%
registrants were slated for purging, and over 80% of those slated were ultimat[ely]
purged. (Again, whites reinstated themselves at higher rates than blacks and
Latinos.) According to Dr. Lichtman, the large numbers involved in the 1991 p[urge]
made that the "key year for assessing racially differential impact" of Pennsyl[vania]
law. A. at 385. While the numbers of registrants purged, as well as the magn[itude]
of the disparate impact, decreased in other years, that fact does not undermi[ne the]
significance of the 1991 figures. To the contrary, as Dr. Lichtman explained, [given]
that a relatively smaller proportion of black than white registrants were avai[lable]
for purging after 1991, it is striking that in 1992 even a small difference be[tween]
whites and blacks persists." A. at 391.

[0] In stating its findings with respect to housing and employment, the district c[ourt]
observed that the City has been held liable for practicing discrimination [in]
these areas. Ortiz, 824 F. Supp. at 533-35.

7

of the City of Philadelphia," the court concluded, "affect the ability of these min[ority]

groups to participate in the political process and to elect candidates of their cho[ice]."

Ortiz, 824 F. Supp. at 535.  In the court's view, that conclusion was "further supp[orted]

by statistical evidence demonstrating that minority voters in Philadelphia do not e[xercise]

their right to vote to the same extent as white voters, which in part may be attrib[utable]

to discrimination and the overall socioeconomic status of minorities in Philadelph[ia]."

Id.

The record thus shows that Pennsylvania's non-voting purge law operates t[o]

remove blacks and Latinos from Philadelphia registration rolls at substantially hig[her]

rates than whites.  In addition, it establishes that black and Latino Philadelphian[s]

suffer disadvantages and discrimination in various socioeconomic categories.

Specifically, the findings indicate that members of these groups are less educated.

are in poorer health, and they experience greater difficulty acquiring adequate me[dical]

care.  They own fewer homes.  They are less frequently employed. They have lower i[ncome.]

Finally, they do not vote as often. The district court even demonstrated its unders[tanding]

of the relationship between these familiar facts: that socioeconomic disparities, w[hich]

are linked to past and present discrimination, make members of minority groups less[ able]

and less likely to participate in the political process.  Prior to today's decision[, I]

would have thought that given this proven reality, courts could easily appreciate t[he]

discriminatory effect of Pennsylvania's non-voting purge law, as well as the legal

significance of that effect under § 2 of the Voting Rights Act.

II.

8

In 1982, in response to the Supreme Court's decision in <u>Mobile v. Bolden,</u> U.S. 55 (1980), Congress amended § 2 to make clear that in determining whether this provision of the Voting Rights Act has been violated, courts should apply the "resu test" that the Supreme Court articulated in <u>White v. Register</u>, 412 U.S. 755 (1973), than require plaintiffs to prove that a voting practice or procedure was motivated discriminatory intent. <u>E.g.</u>, <u>Thornburg v. Gingles</u>, 478 U.S. 30, 35 (1986). Accord § 2(a) prohibits all states and political subdivisions from applying any qualificat prerequisite to voting, or any standard, practice, or procedure "in a manner <u>which</u> in a denial or abridgement of the right of any citizen of the United States to vote is a member of a protected class. 42 U.S.C. § 1973(a) (emphasis added). Section 2 sets forth the legal standard for meeting the results test adopted in § 2(a); drawn directly from the Court's language in <u>White</u>, § 2(b) states:

> A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b). Distilling the central meaning of this statutory language in <u>Gingles</u>, the Supreme Court stated: "The essence of a § 2 claim is that a certain el law, practice, or structure <u>interacts with social and historical conditions to caus</u> <u>inequality in the opportunities</u> enjoyed by black and white voters to elect their pr representatives." <u>Gingles</u>, 478 U.S. at 47 (emphasis added).[0]

---

[0] The <u>Gingles</u> Court only referred to blacks because of the facts of that case. discussion of § 2 applies equally to Latinos, who are also members of a protected class under the Voting Rights Act. 42 U.S.C. §§1973b(f)(2), 1973ʟ(c)(3).

9

When Congress amended § 2, it instructed that in determining whether poli

processes remain equally open to members of protected groups, in the way the Act re

courts must conduct "a searching practical evaluation of the `past and present real

S. Rep. No. 97-417, 97th Cong., 2d Sess. 30 (1982), reprinted in 1982 U.S.C.C.A.N.

("Sen. Rep.").[0] The Supreme Court had taken such an approach in White, 412 U.S. at

70, and, following the 1982 amendments, it has emphasized the importance of the

congressional mandate to maintain a searching practical perspective when evaluating

effects, and thus the lawfulness, of a challenged voting practice or procedure. Se

Gingles, 478 U.S. at 45, 62-63, 66 (repeatedly quoting and following Congress's

instruction to conduct a searching practical evaluation of reality in § 2 inquiries

Additionally, in expanding on this required approach, Congress instructed that in a

§ 2, courts should take a functional view of political processes as opposed to a

formalistic one. Sen. Rep. at 30 n.120; see also Jenkins v. Red Clay Consolidated

Dist. Board of Education, 4 F.3d 1103, 1122 (3d Cir. 1993) ("The Senate Report repe

emphasizes that the court must evaluate plaintiffs' claims under `a searching pract

evaluation of the past and present reality and on a functional view of the politica

process.'" (quoting Gingles, 478 U.S. at 45; omitting internal quotation and citati

petition for cert. filed, 62 U.S.L.W. 3396 (U.S. Nov. 17, 1993) (No. 93-812).

In keeping with this clearly expressed congressional intent, as well as w

post-1982 Supreme Court and Third Circuit decisions which faithfully do so, we must

functional rather than a formalistic view of political processes and the way in whi

---

[0]     The Supreme Court has relied upon the Report of the Senate Judiciary Committee
        "authoritative source for legislative intent" behind the 1982 amendments.
        Gingles, 478 U.S. at 43 n.7.

10

are affected by challenged voting measures.  Our understanding of what the Voting R

Act means when it requires that such processes remain "equally open to participatio

members of a protected class must be informed by a searching practical evaluation o

and present reality. With this functional, practical, and realistic perspective --w

in my view, the majority fails to achieve -- we can then turn to the question that

Supreme Court has identified as the essence of a § 2 claim: whether "a certain ele

law, practice, or structure interacts with social and historical conditions to caus

inequality in the opportunities" enjoyed by members of racial and language minoriti

Gingles, 478 U.S. at 47.

A.

The majority devotes considerable effort to supporting the proposition th[at in] order to prove a violation of § 2, plaintiffs must demonstrate "some causal connect[ion] between the challenged electoral practice and the alleged discrimination." Maj. Op. Typescript at 11. In fact, in its view, that is the "the primary legal issue befor[e us]." Id. I agree that § 2 plaintiffs must show a causal connection between the voting p[ractice] they challenge and the deprivation of equal political opportunity they allege. Thi[s point] -- which, I believe, the plaintiffs also accept[0] -- is not open to question. The l[anguage] of the Voting Rights Act, the legislative history of the 1982 amendments, and contr[olling] precedent all foreclose any argument that a voting practice can violate § 2 without [itself] resulting in, or playing some part in causing, the abridgement of citizens' voting [rights]. The majority, however, actually requires something more than and different from the [causal] connection it initially describes. From its uncontroversial answer to what it pres[ents as] the primary legal question, it departs from and distorts the meaning of § 2.

---

[0]  According to the majority, the plaintiffs have argued that they need not show [a] causal connection between a challenged voting practice and the discrimina[tory] effect of which they complain. Maj. Op. Typescript at 15. That is not a[n] accurate characterization of the plaintiffs' position. In their brief, t[he] plaintiffs insist that they have "never asserted that the discriminatory [effect] need not be in part attributable to the purge." Appellants' Brief at 41[.] The district court misunderstood them, they explain, when it formed the impression that they denied that causation was relevant to their claim. Neither the majority nor the City has advanced a waiver argument. Thus, regardless of whether the plaintiffs ever took the untenable position for [which] they received credit in the district court, the important point, for pres[ent] purposes, is that contrary to the majority's description of their argumen[t, they] have not denied the relevance of causation here.

12

On two occasions, the district court stated that the plaintiffs had not p

violation of § 2 because they had failed to demonstrate that "the purge law is the

dispositive force in depriving minority voters of equal access to the political pro

. . ."  Ortiz, 824 F. Supp. at 539 (emphasis added); see also id. at 524.  That is

proper legal standard.  Section 2 does not require plaintiffs to prove that a chall

voting practice or procedure is "the dispositive force," or the only cause, or even

principal cause, of unequal political opportunity.  Neither the statute, nor its

legislative history, nor the relevant case law supports such a reading.  To the con

that authority requires us to determine whether a challenged law interacts with oth

external conditions to limit the political opportunities available to members of pr

classes.  Gingles, 478 U.S. at 47.  As White and § 2(b) state, we must consider the

totality of the circumstances.  Those circumstances -- the "social and historical

conditions" that make up the "past and present reality" surrounding political proce

create the factual environment in which a challenged voting practice operates.  As

they necessarily contribute to the effect that a practice has on individuals' polit

opportunities.  In order to properly apply § 2 in this case, we cannot require the

plaintiffs to prove that Pennsylvania's non-voting purge law operates, by itself an

independently of other circumstances, to produce discriminatory results.  The chall

law must certainly be a contributing cause of unequal opportunity, but it need not

the district court twice suggested, "the dispositive force."

At oral argument, the City conceded this point.  It did not defend the

"dispositive force" language that appears in the district court's opinion, but inst

argued that in spite of these erroneous comments, the court understood and applied

13

proper legal standard.  To an extent, I am inclined to agree with that position.  A

(though slightly charitable) reading of the district court's analysis reveals that,

least on occasion, it seems to have understood that while § 2 plaintiffs must demon

that a voting practice interacts with other, external circumstances to cause an act

effect, such plaintiffs need not establish that the practice is the dispositive or

primary cause of the results giving rise to their claim.

The majority, however, in contrast to the City, does not in any way quali

support for the district court's statements.[0]  Instead, it adopts the view that in

to have established a violation of § 2, the plaintiffs would have needed to prove t

non-voting purge operated independently of social and historical conditions to caus

inequality of which they complain.  Thus, the majority concludes that while black a

Latino voters have turned out in lower numbers, the purge law did not cause that

statistical disparity.  Maj. Op. Typescript at 21. And because the plaintiffs have

shown that the purge law itself has prevented members of minority groups from votin

have failed to prove the kind of causation that the majority reads § 2 to require.

this construction, a challenged voting law is permissible unless it is entirely

responsible for the abridgment of plaintiffs' political opportunities; if other fac

---

[0]     The majority understands the phrase "the dispositive force," as the district c
        used it, to mean "a cause which, in that context, would be legally dispos
        Maj. Op. Typescript at 18 n.11.  I do not grasp the purpose or effect of
        translation.  The majority does not disagree with the substance of the co
        statements; instead, it reads § 2 to require proof of a "legally disposit
        cause, by which it means a single cause of all relevant circumstances, th
        entirely responsible for the discriminatory effect of which a plaintiff
        complains.  There is no place, in the majority's construction of § 2, for
        contributing causes of inequality which are not themselves products of th
        challenged voting law.  As I explain below, I do share this view.

14

interact with the challenged law to bring about such a discriminatory result -- abs

proof that those factors are themselves products of the law -- no violation of § 2

occurred.[0]

Accordingly, the majority states that the discrimination and disadvantage

the plaintiffs experienced in education, employment, health care, housing, and inco

which the district court found and documented, "just are not relevant." Maj. Op.

Typescript at 25; see also id. at 29 (stating that societal disadvantages are "extr

to the plaintiffs' legal claim).  Such social and historical conditions do not matt

explains, because "the record reveals no link", by which the majority means no caus

---

[0]  Interestingly, while the majority first asserts that the plaintiffs have argue
causation is unimportant (see supra p. 10 n.6), it later claims that Orti
entire complaint "is drawn to allege that Pennsylvania's purge statute `c
the disparate purge rates between Philadelphia's white and minority
communities."  Maj. Op. Typescript at 19-20 (quotation unattributed); see
Maj. Op. Typescript at 10 n.4 and accompanying text (perhaps suggesting t
plaintiffs' complaint improvidently endorsed the majority's construction
§ 2).  That would certainly be a curious way for a party who rejected the
relevance of causation to plead a § 2 case.  In fact, the plaintiffs have
pleaded, accepted, or claimed to have met the legal standard of causation
the majority now adopts.  See Appellants' Brief at 37 (arguing that "[t]h
does not require a demonstration that the practice in and of itself resul
discriminatory result," and claiming to have "demonstrated that historic,
political, and socio-economic discrimination interacts with the non-votin
to disproportionately disenfranchise Latinos and African-American voters'
at 14, 31, 41 n.8 (arguing that the purge law, operating in conjunction w
social and historical conditions, was a contributing cause of the
disproportionate purging of Latinos and blacks); see also A. at 18-20
(plaintiffs' complaint, not pleading any view of § 2 causation). Nor have
plaintiffs pleaded or argued the opposite extreme -- that causation is
irrelevant.  As they state in their brief, they accept that in order to p
they must show that the discriminatory result of which they complain must
attributable, in part, to the law they challenge.  Appellants' Brief at 4
n.8.  Of course, even if the plaintiffs had taken either of the directly
opposing erroneous positions the majority attributes to them, that would
require us to adopt an erroneous construction of § 2 in deciding this cas

15

link, between those factors and the purge law.  <u>Id</u>. at 25.  After all, nothing in t

record suggests that the non-voting purge makes black and Latino residents of Phila

so much worse off.  It is not the purge law that causes members of minority groups

less frequently, and therefore to lose the ability to vote more often by removing t

disproportionately high rates from the registration rolls. That is the kind of "leg

dispositive" causal connection that the majority would require the plaintiffs to es

in order to prevail on their § 2 claim.[0]

---

[0] The majority's reading of the Senate Report casts additional light on the subs
of its rationale.  In its view, the Report expresses the expectation that
would "focus on the challenged procedure and its causal consequences . .
Maj. Op. Typescript at 14 n.6.  The "focus" the majority has in mind, how
is quite restrictive; it encompasses nothing more than the challenged law
it excludes all other factors that the law has not created, but which
nonetheless might contribute to the law's effect.  Thus, under the majori
reading of the Senate Report, Congress has instructed that § 2 might proh
purge statute which "itself" produces discriminatory results.  <u>Id</u>.

The Senate Report does support the well-settled point that plaintiffs must pr
causal connection between the law they challenge and the discriminatory result
identify. Congress in no way, however, expressed any agreement with the majori
view that the challenged law must itself account for its unlawful effects.  Ac
to the Senate Report, a court's "focus" must remain broad and varying enough t
encompass the totality of the circumstances with which a voting practice invar
interacts to influence the nature of political processes.

In concluding its opinion, the majority appears to abandon its causation argum
The dissent might have meaning, it states, in a § 2 challenge to registration
procedures in which plaintiffs alleged that as a result of socioeconomic
disadvantages, they experienced greater difficulty traveling to registration o
or in some other way availing themselves of registration opportunities.  Maj.
Typescript at 29.  That surprising comment cannot be reconciled with the major
legal argument.  If the conditions of inequality the district court found here
extraneous to the plaintiffs' legal claim, those circumstances could not be re
in the hypothetical suit the majority describes.  In neither case could member
protected class show that the laws they challenged caused the practical diffic
they experienced.  In neither case would the laws themselves be responsible fo

16

Finally, the majority reasons that this type of causation could not, unde

circumstances, exist here, because a non-voting purge law, by its very nature, only

affects people who have managed to register at least once.  Maj. Op. Typescript at

Such people, it points out, must have already demonstrated their ability to overcom

whatever barriers might prevent them from participating in the political process, a

law that merely requires them to do so again could not violate §2.  Id.  The premis

underlying this reasoning can only be that unless a law has prevented members of a

protected class from ever having registered or cast a vote, it is permissible under

Voting Rights Act.

According to the Supreme Court, the essence of a § 2 claim is that a cert

electoral law interacts with other circumstances to cause unequal political opportu

Gingles, 478 U.S. at 47.  The majority takes a different position.  In its view, th

essence of a § 2 claim is that a certain electoral law actually causes whatever

circumstances might contribute to the deprivation of political equality of which a

plaintiff complains. Respectfully, that is an unsupported and insupportable distort

the Voting Rights Act with which I could not disagree more strongly.

---

disparately harmful effects on minority citizens.  Rather, under the majority'
theory of § 2 causation, the unfortunate results of whatever registration laws
in mind would merely represent another of "society's voting ills" that would n
subject to challenge under the Voting Rights Act.

I do not know and cannot guess why the majority believes that I am actually co
with Philadelphia registration procedures that the plaintiffs have not challer
rather than with what I view as the discriminatory effect of the non-voting pu
law.  I also cannot perceive a difference between the majority's hypothetical
where, it states, socioeconomic disadvantages might have meaning --and the one
us now.  In any event, I do not read the majority's conclusion as expressing a
purposeful modification or qualification of its earlier analysis of § 2 causat

17

The majority offers a simple explanation for the fact that a disproportio[nately] high number of Latinos and blacks have been removed from Philadelphia's registratio[n] rolls: minority citizens are purged more because they vote less.  The majority's re[ading] of § 2 does not require it to know anything more about the underlying causes of the[se] effect.  It need not look any deeper, or any more closely.  It need not concern its[elf] with <u>why</u> blacks and Latinos vote less; so long as the purge law itself is not respo[nsible,] no violation of § 2 has occurred.

The majority's explanation for the purge law's effect -- the fact that mi[nority] voters simply do not vote as often --does not explain much.  Rather, that fact lies [on] the surface of the past and present reality confronting members of minority groups [who] might try to participate in the political process.  As the district court demonstra[ted, it] is not difficult to look beneath the surface.  And contrary to the majority's view, [this] inquiry is not only important, but necessary.  The majority has erred in concluding [that] § 2 does not require a more searching evaluation of the reasons why Latinos and bla[cks do] not vote as often.

The district court recognized that the lower minority turnout statistics [may in] part be attributable to discrimination and the overall socioeconomic status of mino[rities] in Philadelphia."  <u>Ortiz</u>, 824 F. Supp. at 535.  And regardless of any uncertainty t[he] court had about the relationship between discrimination and socioeconomic disadvant[age,] on the one hand, and lower participation rates, on the other, Congress and the Supr[eme] Court have provided answers.  The Senate Report states that, as the Court observed [in] <u>White</u>, disadvantages in education, employment, income levels, and living conditions [ ] arising from past discrimination tend to depress minority political participation.

18

Rep. at 29.  "Where these conditions are shown,"  the Report continues, "and where

level of black participation in politics is depressed, plaintiffs need not prove an

further causal nexus between their socioeconomic status and the depressed level of

political participation."  Id.[0]

As early as 1899, W.E.B. Du Bois described the barriers to meaningful pol

participation that black Philadelphians experienced as a result of their poverty, l

education, and susceptibility to manipulation by local party organizations.  See W.

---

[0]  Significantly, in White -- the case from which Congress borrowed the words th
make up § 2, and on which Congress relied most heavily in explaining what it
intended that language to mean -- the Court did not look for or require any '
between the challenged reapportionment plan and the factors that contributed
plan's discriminatory effect.  White recounts, among other circumstances, the
following findings: Texas had a "history of official racial discrimination .
which at times touched upon the right of Negroes to register and vote and
participate in the democratic processes", 412 U.S. at 767; "the Bexar communi
along with other Mexican-Americans in Texas, had long `suffered from, and con
to suffer from, the results and effects of invidious discrimination and treat
the fields of education, employment, economics, health, politics, and others'
U.S. at 768 (footnote omitted; quoting district court opinion); and "[t]he ty
Mexican-American suffers a cultural and language barrier that makes his
participation in community processes extremely difficult . . . ." Id. (footno
omitted).  "The residual impact of this history," the Court observed, "reflec
itself in the fact that Mexican-American voting registration remained very po
the County . . . ." Id.  Plainly, these social and historical conditions had
been brought about by a reapportionment plan that Texas promulgated in 1971.
Rather, they interacted with the challenged multimember districts to result i
invidious discrimination.  As the Supreme Court stated, "[b]ased on the total
the circumstances," the district court had properly assessed the lawfulness o
multimember district, "overlaid, as it was, on the cultural and economic real
of the plaintiff class.  White, 412 U.S. at 769 (emphasis added).  Those real
of course, predated and existed independently of the recent reapportionment.
the White Court, that did not matter. For the majority, nothing else would.
in codifying and relying on White when it amended the Voting Rights Act, Cong
could not have shared the majority's understanding of the kind of causation §
requires.

19

Bois, The Philadelphia Negro: A Social Study 373-75 (1899).  Gunnar Myrdal, in a wo

which the Supreme Court has relied in defining equal justice under law, has also no

"the striking relationship between nonvoting and poverty."  Gunnar Myrdal, An Ameri

Dilemma: The Negro Problem and Modern Democracy, 493 (1944) (cited in Brown v. Boar

Education, 347 U.S. 483, 494 n.11 (1954)).  But we should not have to depend on lan

works of social science to understand this point.  We need only follow Congress's

instruction that in assessing the way a voting law affects individuals' opportuniti

participate in political processes, we conduct an evaluation of past and present re

Councilman Ortiz described that reality at trial, where he testified that in

Philadelphia's Latino community:

> [Y]ou have a population that is surviving from day to day[,] and to
> try to bring the concept of voting into their world, into their vista,
> is difficult.  [T]hey have a survival mode.  They have to be able to
> put some food on the table for the next day. And we've had
> difficulties trying to convince folks that the political system is
> going to make a difference in their lives, that by participating in
> the process, they're going to effect a change.

A. at 127 (repetitive speech omitted).  Black and Latino residents of Philadelphia,

as the district court found, have suffered discrimination and disadvantage in every

socioeconomic category, have fewer resources to devote to the tasks of registration

voting.  Moreover, their experience has often taught them that such efforts will no

improve their lives. Frustration and alienation can lead to apathy, which decreases

participation, which further erodes the political power of minority groups.  Judge

---

[0]    The evaluation need not be particularly searching.  As the district court put
"In fact, in evaluating a challenge to an election procedure pursuant to § 2,
would be myopic for a court to overlook the impact that [socio-economic] fact
have on minority voter turnout." Ortiz, 824 F. Supp. at 525.  Under the major
construction of § 2, however, courts have no need for even limited vision of
underlying causes which contribute to a challenged law's effect.

20

described this cycle of discrimination, disadvantage, and disenfranchisement in Uni

States v. Marengo County Comm'n, 731 F.2d 1546, 1567 (11th Cir. 1984), where he not

"[p]ast discrimination may cause blacks to register or vote in lower numbers than w

[and] may also lead to present socioeconomic disadvantages, which in turn can reduc

participation and influence in political affairs."  A law that purges registrants f

failing to vote can only contribute to the symbiotic causes and effects of socioeco

and political inequality.  Thus, for Latinos and blacks, having their registration

nullified only confirms what they are more likely to already believe: that given th

higher costs and lower benefits of participating in the political process, there is

no point in making the effort.

Even if we could not achieve our own understanding of this reality, its t

plain enough that Congress and the Supreme Court have told us to take it on faith.

citing White, the Senate Report states that where plaintiffs can show socioeconomic

disadvantage and discrimination along with depressed rates of political participati

they need not prove any further causal nexus between these facts.  Sen. Rep. at 29

Of course, if the majority is right, the existence of such a causal nexus would def

challenge to a law that had a disparate impact on those who voted less often.  The

majority, once again, would require the plaintiffs here to have proven that the pur

itself caused minority voters to be removed from the registration rolls at

disproportionately high rates.  Factors like poverty, lack of education, and inabil

find work or housing as a result of discrimination, it states, are simply not relev

Maj. Op. Typescript at 25.  However, we know that while the non-voting purge law ma

some part in further discouraging black and Latino political participation, it is l

21

societal discrimination and socioeconomic disadvantage, of the sort the district co

found, that operate to depress minority turnout rates.  If discrimination and disad

cause blacks and Latinos to vote less often, which we discover by consulting either

record or reality, then the purge law itself cannot be responsible for removing so

more members of these groups from the registration rolls.  That is undeniable. The

plaintiffs do not and cannot argue otherwise.  So, if the majority is right, Congre

the Supreme Court -- by relieving plaintiffs of the need to prove a causal connecti

between discrimination and socioeconomic disadvantage, on the one hand, and lower

participation rates, on the other -- have effectively immunized non-voting purge la

§ 2 challenges.  Such laws cannot be responsible for the disparate impact they have

as a matter of law, discrimination and disadvantage are at least principally to bla

Clearly, though, Congress and the Court have done no such thing, and the majority h

erred in its construction of § 2.

The district and appellate court decisions in <u>Mississippi State Chapter,</u>

<u>Operation PUSH v. Allain</u>  674 F. Supp. 1245, 1263-68 (N.D. Miss. 1987) ("<u>Operation</u>

<u>I</u>"), <u>aff'd sub nom.</u> <u>Mississippi State Chapter, Operation PUSH, Inc. v. Mabus</u> ("<u>Oper</u>

<u>PUSH III</u>"), 932 F.2d 400 (5th Cir. 1991), a case which closely parallels this one,

properly apply § 2 and reject the majority's position.  In <u>Operation PUSH</u>, the plai

challenged two Mississippi registration laws: one, the State's "dual registration

process," required citizens to register first with a county registrar in order to v

federal, state, and county elections, and again with a municipal clerk in order to

municipal elections; the other, the State's prohibition of "satellite registration,

severely limited the extent to which citizens could register at places other than t

22

registrar's office.  Operation PUSH III, 932 F.2d at 402.  The district court foun[d]
these procedures had a substantial disparate impact on black registration rates.  T[he]
disparity, it concluded, resulted in minority members of the electorate having less
opportunity to participate in the political process and thus established a violati[on of]
§ 2.  Operation PUSH I, 674 F. Supp. at 1268.  Of course, Mississippi's registrati[on laws]
had not themselves caused the failure of blacks to register as often as whites.  Th[at]
inequality occurred, as the court of appeals put it, "[b]ecause a significant perce[ntage]
of Mississippi's black citizens do not have (1) access to the transportation necess[ary to]
travel to the county courthouse to register or (2) the type of jobs that would allo[w them]
to leave work during business hours to register to vote . . . ."  Operation PUSH I[II, 932]
F.2d at 403; see also Operation PUSH I, 674 F. Supp. at 1255-56.[0]  Those circumstan[ces]
interacted with the challenged law to create a disparity in registration rates, whi[ch gave]
rise to a § 2 violation.  Operation PUSH I, 674 F. Supp. at 1255-56, 1268.  In affi[rming]
that ruling, the Eleventh Circuit did not express any doubt as to the soundness of [this]

---

[0]    The district court found that the registration laws had "a disparate impact o[n the]
opportunities of black citizens in Mississippi to register to vote because of
socio-economic and occupational status."  Operation PUSH I, 674 F. Supp. at 1[255.]
In particular, the court focused on three significant forms of socioeconomic
disadvantage: (1) "that black workers in Mississippi predominate in blue-coll[ar and]
service worker positions in which they are likely to be working for an hourly [wage]
and are less likely to be able to take off from work to register to vote duri[ng]
regular office hours . . . [;]" (2) that "black citizens are also much less a[ble]
than whites to travel to the county courthouse, or other centralized voter
registration locations" because black households were much less likely to hav[e a]
vehicle available; and (3) that "a disproportionately high percentage of blac[k]
households do not have a telephone available for household use," which made i[t more]
difficult for blacks to obtain information about procedures for registering. [Id. at]
1253, 1256. Because of these disadvantages, the district court concluded, bla[cks]
experienced greater difficulty in overcoming the administrative barriers to
registering that Mississippi had created through its challenged laws.  Id. at [1255.]

23

district court's reasoning.  The only question, in its view, was whether the court

erred in finding that blacks had registered in significantly lower numbers.  <u>Operat</u>

<u>PUSH III</u>, 932 F.2d at 409-13.  Given the evidentiary support for the trial judge's

determination that such a disparity did exist, the Eleventh Circuit upheld the deci

that the challenged laws, and the effect they had, violated § 2.

   Unlike the majority, the <u>Operation PUSH</u> courts did not merely note that b

registered less often, and that the registration laws themselves were not responsib

the disparity.  Instead, the courts looked to the way in which the challenged laws

interacted with social and historical conditions, such as the class members' occupa

status and limited access to transportation and information, to result in a lack of

opportunity for the plaintiffs to participate in the political process.  The obviou

that the causes of those conditions had little or nothing to do with the challenged

registration laws was legally irrelevant to the <u>Operation PUSH</u> courts, which clearl

not share the majority's understanding of § 2.[0]

---

[0]   The majority's attempt to distinguish the <u>Operation PUSH</u> cases is unpersuasiv
states that in <u>Operation PUSH</u>, unlike this case, the challenged voting laws w
"<u>the causes</u> of black voters' registering at lower rates than white voters."
Op. Typescript at 24 n.17 (emphasis added).  The <u>Operation PUSH</u> courts, howev
clearly did not find, and did not require the plaintiffs to show, that Missis
registration procedures were "the causes" of the statistical disparity in
registration rates.  There was no established causal "link" -- as the majorit
it elsewhere -- between the challenged laws, on the one hand, and either the
of jobs black residents held, or the facts that they possessed fewer cars and
telephones, on the other.  Rather, those conditions interacted with the regis
procedures to produce a discriminatory result, and that constituted a violati
§ 2.

The majority's treatment of <u>Operation PUSH</u> also suggests that it sees a meani
difference between laws that make registration more difficult to begin with,

24

United States v. Marengo County Comm'n, 731 F.2d 1546 (11th Cir. 1984), i

similar, in significant respects, to Operation PUSH, and also rejects the majority'

of the kind of causation a plaintiff must show in order to prevail on a § 2 claim.

Marengo County, black plaintiffs challenged laws that provided for the at-large ele

of members of the County Commission and the school board.  The district court, in

dismissing the case, had "attributed the absence of elected black officials to `vot

apathy' and `a failure of blacks to turn out their votes.'"  Marengo County, 731 F.

1568 (quoting the district court opinion).  The Eleventh Circuit rejected the distr

court's findings as clearly erroneous and reversed.

In reaching its decision, the Marengo County court relied, in part, on th

plaintiffs' showings that (1) the County Board of Registrars was open infrequently

never visited outlying areas to register rural voters, and (2) the County had not

permitted a black person to serve as a deputy registrar.  Id. at 1570.  The distric

had stated that it did not see how such policies discriminated against blacks.  The

of appeals responded:

> These policies, however, unquestionably discriminated against
> blacks because fewer blacks were registered. . . .  By holding short
> hours the Board made it harder for unregistered voters, more of whom
> are black than white, to register.  By meeting only in Linden the
> Board was less accessible to eligible rural voters, who were more
> black than white.  By having few black poll officials and spurning the
> voluntary offer of a black citizen to serve as a registrar, county
> officials impaired black access to the political system and the
> confidence of blacks in the system's openness.

one hand, and laws that make it more difficult for someone to stay registered
the other.  In my view, that is not a reasonable distinction.

25

Marengo County, 731 F.2d at 1570 (footnote and citation omitted). Like the Operatic

courts, the Eleventh Circuit did not require the plaintiffs to prove that the measu

they challenged were responsible for their failure to register or vote.  In fact, i

rejecting the district court's finding that blacks had simply failed to overcome th

apathy, the court explained that a variety of social and historical circumstances

accounted for the fact that blacks participated in significantly lower numbers than

whites.  Id. at 1568, 1574.  Those proven circumstances, in conjunction with the

challenged voting practices, had a discriminatory effect on blacks.  For that reaso

court concluded, the record compelled a finding that the County's at-large electio

violated § 2.  Id. at 1574.[0]

The majority relies on Salas v. Southwest Texas Junior College Dist., 964

1542 (5th Cir. 1992), for the proposition that "a protected class is not entitled t

relief merely because it turns out in a lower percentage than whites to vote." Maj.

Typescript at 21.  The context of that statement, however, reveals that Salas provi

support for the majority's holding.  In Salas, Hispanic voters, who constituted a m

of the registered voters in an at-large district, challenged the use of the at-larg

---

[0]     Other cases that do not share the majority's view of § 2 include: Harris v.
Graddick, 593 F. Supp. 128 (M.D. Ala. 1984) (awarding an injunction to black
citizens who claimed that a state's failure to appoint greater numbers of bla
officials violated § 2), and sub nom., Harris v. Siegelman, 695 F. Supp. 517
Ala. 1988) (holding that plaintiffs established violations of § 2, based on t
conclusion that social and historical circumstances interacted with the chall
law, as well as with the disproportionately low number of black polling offic
to discourage black political participation); and Brown v. Dean, 555 F. Supp.
(D.R.I. 1982) (enjoining a city's use of a polling facility based on a findin
the facility's location would be a substantial deterrent to voting by a class
black residents).

26

system (as opposed to single-member districts) under § 2.  The court held that the

plaintiffs had failed to satisfy the third element of the threshold test for vote d

claims that the Supreme Court adopted in Thornburg v. Gingles, because they had not

demonstrated that white bloc voting usually prevented Hispanics from electing their

preferred representatives.  Salas, 964 F.2d at 1555.  The Fifth Circuit reasoned th

though the plaintiffs were members of a class that included a majority of the regis

voters in the challenged district, they might nonetheless, in some instances, have

able to show that minority bloc voting frustrated their chances of electoral succes

For example, if such plaintiffs could establish that they faced "practical impedime

voting" or that "low turnout at elections was the result of prior official

discrimination," they could prove that their registered majority did not allow the

to overcome opposition from a cohesive minority of whites.  Id. at 1555-56. In such

circumstances, which the plaintiffs in Salas had failed to prove, an at-large distr

would be subject to a § 2 challenge brought by members of a majority class.  But th

plaintiffs had not accounted, in any way, for their inability to take advantage of

majority status.  In that context, we can understand the court's statement that "a

protected class is not entitled to § 2 relief merely because it turns out in a lowe

percentage than whites to vote."  Salas, 964 F.2d at 1556.

Here, the plaintiffs are not members of a majority class confronting the

difficult task of satisfying the Gingles preconditions.  The questions this case pr

and the factors that we must take into account in providing answers, are somewhat

different.  Nonetheless, to the extent that Salas does provide guidance, the decisi

actually rejects the majority's reading of the Voting Rights Act.  According to the

27

Circuit, the plaintiffs in Salas could have prevailed if they had shown the exister

"practical impediments to voting" or low turnout rates resulting from prior discrim

(as may have occurred here, according to the district court). Those circumstances,

court reasoned, could interact with the state's districting plan in such a way as t

deprive class members of an equal opportunity to participate in the political proce

to elect their chosen representatives. Under the majority's construction of § 2, h

the Salas plaintiffs would have needed to prove that the voting measure they challe

an at-large district, actually caused the practical impediments to voting or the lo

turnout rates that compromised their chances for success. Of course, that is an

impossible requirement. District lines, like purge laws, cannot by themselves caus

"totality of the circumstances" that courts are supposed to consider in applying §

Fifth Circuit would not have required the Salas plaintiffs to make such a showing.

majority here, in contrast, holds that because Pennsylvania's non-voting purge law

itself the cause of blacks' and Latinos' failure to vote more often, the plaintiffs

not established a violation of § 2. Salas does not take that view, and neither do

In addition to Salas, the majority relies on Irby v. Virginia State Board of
Elections, 889 F.2d 1352 (4th Cir. 1989). It is difficult to overstate the
differences between Irby and the case before us. In Irby, a group of individe
black plaintiffs and two civil rights organizations challenged a law that pro
for the appointment, rather than the election, of school board members. Firs
assuming appointive systems are subject to challenge under § 2 -- a propositi
about which the Fourth Circuit expressed "considerable doubt", Irby, 889 F.2d
1357 -- the legal and factual variables involved in such a case, where no vot
no electing has ever occurred, could not be comparable to those involved here
elsewhere). Second, in Irby, the plaintiffs had failed to show any causal
connection between the selection system they challenged and the underrepreser
of blacks on school boards; for example, the court pointed out, in one of the
counties where a statistically significant disparity did exist, every black r
who had requested appointment to the school board since 1971 had been selecte

28

In amending § 2, Congress devoted most of its attention to vote dilution

White v. Register, for example, the case from which Congress drew the legal standar

defining a violation of § 2, involved a challenge to state reapportionment plans.

Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. 1973), which articulated and enumerate

factors that the Court had taken into consideration in White, addressed the legalit

multi-member districts.  The Senate Report's now-familiar list of "typical" (but no

exclusive or required) factors that plaintiffs can show in establishing a violatio

is drawn directly from Zimmer.  See Sen. Rep. at 29.  Congress made clear, however,

while it had focused and relied mainly on vote dilution cases in amending § 2 and

explaining the new provision's meaning, § 2 would continue to prohibit "all voting

discrimination," including "episodic" practices which did not involve the "permaner

structural barriers" to political equality seen in the vote dilution context. Sen.

30.  The Report explains:

> If the challenged practice relates to such a series of events or
> episodes, the proof sufficient to establish a violation would not
> necessarily involve the same factors as the courts have utilized when
> dealing with permanent structural barriers. Of course, the ultimate
> test would be the White standard codified by this amendment of Section
> 2: whether, in the particular situation, the practice operated to deny

---

member.  Id. at 1358.  In light of those facts, the Fourth Circuit concluded
the appointive system did not produce a disparate effect.  Id. at 1359. The
court had no occasion even to consider a causation requirement such as the on
majority adopts here, because the challenged practice played no part in bring
about the lower number of blacks on the two school boards.  Such a situation
at all similar to one in which a purge law directly removes disproportionatel
numbers of minority citizens from the registration rolls.

At the very most, Irby provides incremental support for the position that § 2
plaintiffs must show some causal connection between a challenged voting pract
the disparity at issue.  As I have stated, that is not a controversial point,
neither the plaintiffs nor I suggest otherwise.

29

> the minority plaintiff an equal opportunity to participate and to elect candidates of their choice.

Id. Thus, events or episodes occurring during the administration of elections that resulted in unequal political opportunity would remain unlawful, although the facto relevant to proving such discriminatory effects might well be different from those involved in vote dilution cases.

In a footnote to the statement quoted above, Congress mentions purging as variety of the "episodic discrimination" that § 2 would continue to prohibit.[0] The states: "[P]urging of voters could produce a discriminatory result if fair procedur not followed, Toney v. White, 488 F.2d 310 (5th Cir. 1973), <u>or if the need for a pu were not shown</u> or if opportunities for re-registration were unduly limited." Sen. 30 n.119 (emphasis added).[0] For two reasons, this statement does not support an affirmance here. First, as I discuss at greater length below, the City did not pro need" for Pennsylvania's non-voting purge law. The district court found that the l

---

[0] While purging could be conducted "episodically" -- that is, on discrete occas in a related series of events -- I would not describe the annual operation of Pennsylvania's non-voting purge law as "episodic." It is not "structural" in same way as a redistricting plan; nor is it temporary, however, and the law p its discriminatory effects in a reliable and consistent manner from year to y Therefore, I will not refer to the kind of purging that occurred in this case "episodic" voting practice.

[0] By making clear that purging can violate § 2, the Senate Report creates a pot problem for the majority's argument that these laws, because they only affect individuals who have registered and voted, must be permissible. The majority with this problem by emphasizing that in each example of unlawful purging the Report mentions, it is the statute "itself" that produces a discriminatory re Putting aside, for the moment, my more important disagreements with the major reading of § 2's legislative history, and with its theory of causation, the f remains that even a purge law that itself produces unlawful results can only voters who have already registered. This troublesome point, however, is only minor symptom of the infirmity afflicting the majority's argument.

30

served the legitimate purpose of preventing fraud, but laws are not necessary merel[...]
because they serve a valid purpose.  Second, Congress mentioned purging as an examp[...]
the "episodic discrimination" that would remain within the scope of § 2, and the ty[...]
purges it listed in the one sentence it devoted to the subject are merely more spec[...]
examples of the way in which purging can have a "discriminatory result."  Congress [...]
provided no indication that purging could not produce discriminatory results, and t[...]
violate § 2, in other ways.  Indeed, such a suggestion would run directly counter t[...]
flexible approach to § 2 cases that Congress intended courts to follow in situation[...]
involving different factual and legal variables.[0]

In the majority's view, however, the Senate Report's brief and illustrati[...]
reference to purging contains an "implicit" recognition "that a purge statute which[...]
administered fairly, and in an even-handed manner, would not run afoul of the law."[...]
Op. Typescript at 14 n.6.  I have no idea where the majority finds such an implicat[...]
The text of the footnote plainly does not support it.  See Ortiz, 824 F. Supp. at 5[...]
(recognizing that the list in the footnote merely "provides several examples of how[...]
purging voters could violate § 2," and that it does not "establish any prerequisite[...]
plaintiffs . . . must establish in order to state a cognizable claim under the Act'[...]
also, Steve Barber et al., Comment, The Purging of Empowerment: Voter Purge Laws an[...]
Voting Rights Act, 23 Harv. C.R-C.L. L. Rev. 483, 520 (1988) (stating that as the f[...]
makes clear, the types of purges it lists "are merely examples of situations that m[...]

---

[0] As the district court accurately stated, the legislative history expresses "t[...]
importance of applying a flexible approach when evaluating § 2 challenges, ra[...]
than a `mechanical' pointcounting analysis."  Ortiz, 824 F. Supp. at 524; see[...]
Jenkins, 4 F.3d at 1125, 1129 (recognizing the need to maintain a flexible ap[...]
in order to promote the goals and underlying principles of the Voting Rights[...]

31

produce a discriminatory result, rather than an exhaustive list of the only ways in

purges could violate Section 2").  Moreover, Congress expressly disavowed the kind

purpose the majority believes it implied, stating: "[E]ven a consistently applied p

premised on a racially neutral policy would not negate a plaintiff's showing throug

factors that the challenged practice denies minorities fair access to the process."

Rep. at 29 n.117.  Finally, under the majority's perception of what Congress implic

recognized, not even all the examples included in the Report's brief reference to p

would constitute violations of § 2.  An unnecessary purge law that "unduly limited"

opportunities for re-registration, for instance, would not, in the majority's view,

afoul of the Voting Rights Act so long as the law was administered fairly.  Congres

statements, which express a different view, do not dissuade the majority from relyi

an unsupported implication that would severely, and I believe improperly, limit the

of § 2 in challenges to the purging of registered voters.

The Senate Report acknowledges that especially outside the context of vot

dilution claims, the factors that courts should consider in determining whether a

challenged voting practice violates § 2 may well be different than those appearing

list of "typical" factors drawn from White and Zimmer. The Report does not, however

provide any guidance with respect to what factors courts should consider in the typ

case we confront here.  The majority makes no effort to identify or explore the

considerations that figure into an evaluation of the effect and legality of a non-v

purge law, probably because, in light of its theory of causation, it sees no need t

so. The district court, in contrast, addressed this important question, see Ortiz,

Supp. at 523-24, and I agree with some of its conclusions.  As the district court

32

recognized, the factors making up the threshold test for vote dilution claims that

Supreme Court adopted in Thornburg v. Gingles, 478 U.S. at 49-51, have little place

§ 2 challenge to a purge law. Ortiz, 824 F. Supp. at 523 (describing the Gingles

preconditions as "peripheral issues bearing limited relevance to the plaintiffs' cl

see also Operation PUSH I, 674 F. Supp. at 1264 (concluding that the occurrence of

polarized voting is not germane to a § 2 challenge to registration procedures); cf.

v. Treen, 574 F. Supp. 325, 350 (E.D. La. 1983) (three-judge court) ("To the extent

the enumerated factors are not factually relevant, they may be replaced or substitu

other, more meaningful factors.").  The size, geographic insularity, and political

cohesion of minority or majority groups are all irrelevant to the question of wheth

non-voting purge statute has a discriminatory effect.  Such a law operates to nulli

registration of individuals who fail to vote or reinstate themselves.  Therefore, t

important factors are those that influence peoples' willingness and ability to part

or seek reinstatement.  As discussed, the existence of discrimination and socioecon

disadvantage is of primary importance among those factors.[0]  Other significant

considerations could include: a history of official discrimination in voting, effor

with the design or effect of limiting the political power of minority groups, the

difficulty minority constituents have experienced in trying to elect their preferre

candidates, and a lack of responsiveness on the part of elected officials to the

---

[0]     Contrary to the majority's assertion, I have not stated, nor do I believe, th
        societal conditions such as discrimination and socioeconomic disadvantage
        "constitute" the totality of the circumstances that a court should consider i
        evaluating the legality of a non-voting purge statute.  Rather, those factors
        particularly significant circumstances, among others, which contribute to the
        totality.  Additionally, as should be clear, I do not mean for the list of re
        factors I mention here to be exhaustive.

33

particular needs and concerns of minority communities.  Each of those factors could

further discourage participation and therefore, each could interact with a non-voti

purge statute to cause an unlawful abridgement of a group's opportunity to particip

the political process and to elect its chosen representatives.[0]

Given the majority's erroneous construction of § 2, however, this task of

identifying and weighing relevant factors is of secondary importance.  The critical

it bears repeating, is that contrary to the majority's view, whatever the relevant

are, they need not be products of, or causally linked to, a challenged voting law i

to merit consideration in a court's determination of the law's effect and legality.

a law's <u>interaction with</u> the totality of the circumstances, and not its <u>creation of</u>

circumstances, that § 2 requires us to evaluate.

B.

The plaintiffs have argued that in order to prove that Pennsylvania's non

purge law violates § 2, they must, in addition to showing the law's disparate impac

blacks and Latinos, demonstrate that the State could achieve its legitimate goal of

preventing election fraud in a less discriminatory way. As noted above, the Senate

provides some support for that position by stating that if the "need for a purge" i

shown, the practice could constitute an instance of prohibited "episodic discrimina

Sen. Rep. at 30 n.119.  Here, the plaintiffs want to take on the burden of proving

Pennsylvania does not need a purge law that results in the disenfranchisement of

---

[0]      The existence of racial appeals, in contrast, could conceivably increase mino
turnout and thus work against any discriminatory effect that a non-voting pur
might have.  I imagine that this factor could point either way, depending on
nature of the evidence presented in a particular case.

disproportionately high numbers of Latinos and blacks.  Moreover, they have asked u[s]

find that they carried that burden at trial.

I agree with much, though not all, of the plaintiffs' argument.  In enact[ing]

amending § 2, Congress did not intend to mandate equal political opportunity at the

expense of state and local governments' abilities to pursue legitimate goals such a[s]

prevention of voting fraud.  Where measures are in fact necessary to achieve such

objectives, Congress would have surely meant for them to remain in effect.  There i[s no]

point in guaranteeing equal access to corrupt political processes that have no demo[cratic]

value.  To the contrary, the Voting Rights Act is premised on the existence of free[, ]

fair elections that reflect popular will with accuracy and integrity, and it shoul[d not be]

interpreted to prevent such elections from occurring.[0]  However, a voting practice t[hat]

compromises equality, as I believe Pennsylvania's purge statute does, should only b[e]

permitted if it is in fact necessary to achieve or preserve this type of public int[erest.]

---

[0]  I share the majority's concern about Philadelphia's need to guard against fra[ud in] voting practices in administering its elections.  The dispute arising out of [a] State Senate race between Bruce Marks and William Stinson provides a recent r[eminder] of the seriousness of this problem.  See Marks v. Stinson, 19 F.3d 873 (3d Ci[r. ] 1994).  Of course, as we all recognize, the City is no Newcomer to dishonest election tactics.  Nearly 100 years ago, Dr. Du Bois described the widespread practice of buying votes in Philadelphia, and stated: "To-day the government [of the] city and State is unparalleled in the history of republican government for br[azen] dishonesty and bare-faced defiance of public opinion."  W.E.B. Du Bois, The Philadelphia Negro: A Social Study 372, 376-77 (1899).

[0]  According to the majority, "it is well established that purge statutes are a legitimate means by which the State can attempt to prevent voter fraud."  Maj[ority] Typescript at 20 & n.13.  By "legitimate," the majority cannot mean permissib[le] under § 2 of the Voting Rights Act.  The published reports do not contain a s[ingle] case, other than this one, that decides a § 2 challenge to a non-voting purge[.] The only scholarship directly addressing the question argues that such laws a[re] likely to violate § 2. Barber, supra p. 34, at 517-527.

Title VII disparate-impact law, in my view, provides a particularly appro[priate]
analogy supporting the adoption of such a standard. In disparate-impact cases, emp[loyers]
can justify their use of challenged practices that have a greater negative effect o[n]
members of a protected class by proving that such practices constitute a "business
necessity." <u>See</u>, <u>e.g.</u>, <u>Griggs v. Duke Power</u>, 401 U.S. 424, 431-32 (1971) (first
articulating the concept of business necessity); <u>Dothard v. Rawlinson</u>, 433 U.S. 321[, 331-]
32 (1977) (holding that defendant-employer failed to show business necessity, and t[hat,]
therefore, plaintiffs properly prevailed in disparate-impact Title VII case); <u>see a</u>[lso]

The cases the majority credits with recognizing the well-established legitima[cy of]
non-voting purge statutes all resolve constitutional, not statutory challenge[s to]
voting laws. And in fact, of the decisions on which the majority relies, onl[y]
<u>Hoffman v. Maryland</u>, 928 F.2d 646 (4th Cir. 1991), involves a non-voting purg[e law.]
In <u>Hoffman</u>, the court held that Maryland's five-year non-voting purge did not
violate the First Amendment because the law was content-neutral, was designe[d to]
serve the important state interest of curbing vote fraud, and did not unreas[onably]
restrict alternative avenues of communication; the court also rejected the
plaintiffs' Fourteenth Amendment claim because they were not, as non-voters, [part]
of a suspect class. This case, of course, unlike those the majority mentions, [had]
been brought under § 2 of the Voting Rights Act, which no court has read to p[rohibit]
any and all voting laws that serve a valid purpose.

The majority surmises that § 2 challenges to purge laws have not been brought
because they would necessarily fail. Maj. Op. Typescript at 24-25. The assum[ption]
on which that theory rests, of course, is that if an untried claim had any me[rit it]
would not be untried. I do not believe that is so. In the first of the seri[es of]
lectures that would be published as <u>The Nature of the Judicial Process</u>, then-[Judge]
Cardozo described the judge's search for applicable precedent as an attempt "[to]
match the colors of the case at hand against the many sample cases spread out [on]
their desk." Cardozo likened this process to a simple task of flipping thro[ugh a]
card index of decisions. However, he continued, "It is when the colors do n[ot]
match, when the references in the index fail, when there is no decisive prece[dent,]
that the serious business of the judge begins." Benjamin N. Cardozo, <u>The Natu[re of]</u>
<u>the Judicial Process</u> 20-21 (1921). The absence of cases deciding § 2 challen[ges to]
purge laws only means that the legitimacy of such measures is not well-estab[lished,]
and that we have serious business to do here.

36

U.S.C.A. § 2000e-2(k)(1)(A), (C) (codifying the disparate-impact standards develope

and following <u>Griggs</u>, including the business necessity defense, and nullifying <u>War</u>

<u>Packing Co. v. Atonio</u>, 490 U.S. 642 (1989)).  I would take the same approach here.

VII disparate-impact law, like § 2 of the Voting Rights Act, adopts a results test

ensuring that protected individuals will not suffer a deprivation of the type of e

opportunity that the law mandates.  Given the similarities between these two statut

is not surprising that in <u>Griggs</u>, the Supreme Court relied on a Voting Rights Act o

<u>Gaston County, North Carolina v. United States</u>, 395 U.S. 285 (1969) (discussed <u>infr</u>

53-54 n.30), in first explaining how and why Title VII prohibited the sort of

discrimination challenged in a disparate-impact suit.[0]  <u>Griggs</u>'s reliance on <u>Gaston</u>

supports the analogy I am suggesting.

      If an employer can show that an employment practice that operates to the

disadvantage of minority workers is necessary to run its business, that practice is

permissible. Similarly, in my view, if a state or local government can show that a

practice that operates to the disadvantage of minority registrants is necessary to

valid election, that practice would not constitute a violation of § 2.[0]  While the

[0]     <u>Gaston County</u> was brought under § 4(a) of the Voting Rights Act, 42 U.S.C.
      § 1973b(a) (currently 42 U.S.C. § 1973b(a)(1)).  Section 4(a) was -- and foll
      its amendment, still is -- similar to § 2, aside from its placement of the bu
      proof.  It provides that a state or subdivision, in order to reinstate a susp
      voting practice, must show that the practice has not been used "for the purpo
      with the effect of denying or abridging the right to vote on account of race
      color."

[0]     The majority relies on <u>Wesley v. Collins</u>, 791 F.2d 1255 (6th Cir. 1986), whic
      involved a § 2 challenge to a law disenfranchising convicted felons.  As the
      majority notes, in concluding that the law did not violate the Voting Rights
      the <u>Wesley</u> court emphasized "the state's legitimate and compelling rationale
      enacting the statute here in issue."  <u>Id.</u> at 1261.  <u>Wesley</u> is based, to a
      significant extent, on legal principles that justifiably limit the civil righ

37

plaintiffs here have volunteered to prove that Pennsylvania does not need its non-v

purge law to guard against fraud, I would not require them to do so.  Consistent wi

other results-based anti-discrimination law, defendants should bear the burden of p

necessity once plaintiffs establish the existence of a disparate impact.

The plaintiffs argue that the uncontroverted evidence they introduced at

"indisputably establishes that there are reasonable, less discriminatory alternativ

Philadelphia's non-voting purge."  Appellants' Brief at 32.  I disagree. Evidence d

become indisputable merely because it is never disputed.  Some evidence fails on it

without any help from opposing evidence.  Trial judges are not obligated to credit

uncontroverted testimony; they can simply remain unpersuaded.  In this case, the di

court never considered whether the City needed a non-voting purge law to prevent el

fraud because the legal standard it adopted did not include this element.  The cou

that the policy reasons for the law were "not tenuous," and that the law in fact se

its intended purpose. "Not tenuous," however, is a long way from necessary.  The

plaintiffs' evidence would have easily supported a finding that practical, effectiv

discriminatory alternatives to the purge do exist, but it did not "indisputably est

anything. As a court of appeals, we are in no position to resolve this question.

Therefore, under my view of § 2 and the evidence presented, a remand would be appro

---

convicted felons.  Id. at 1261-62.  In that context, a court could readily co
that a statute disenfranchising felons was necessary to serve the state's com
penalogical interests.  It is doubtful that the objective of restricting offe
rights to participate in civil society could be met in a different way.  In a
event, because the plaintiffs here have not lost their rights by committing d
Wesley is distinguishable.

38

The majority, however, without the assistance of the district court, and

evidentiary support, now finds that the non-voting purge law actually is "needed" t

prevent electoral fraud. Maj. Op. Typescript at 26 (relying on "a review of the re

and present reality"). That is an unfounded conclusion. Again, I do not dispute t

purge law serves a valid purpose; I accept the district court's finding that the la

useful in preventing fraud. But neither the anecdotal incidents the majority menti

the record show anything more. Contrary to the majority's apparent view, usefulnes

necessity are two entirely different things. In order to find that the purge law i

needed, as the majority now does, a court must first consider whether equally effec

but less discriminatory alternatives exist, which neither the district court nor th

majority has ever done.

The testimony of Emmett Fremaux, Jr., whom the district court qualified a

expert on election and voter registration procedures, provides the only evidence i

record on the subject of alternatives to the non-voting purge law. Fremaux testifi

the law's important purposes could be achieved more effectively through other mecha

which, unlike purge laws, would not have a pronounced discriminatory effect. A. at

316. He based his opinion, to a significant extent, on his experience in administe

registration and election procedures in Washington, D.C., which had successfully re

its non-voting purge law with a "mail canvass" system. In addition, Fremaux stated

large cities run clean elections without relying on non-voting purges. A. at 331.

Through this testimony, the plaintiffs introduced uncontroverted evidence

more effective, less discriminatory alternatives to a non-voting purge law do exist

Moreover, the City has not suggested that come January, 1995, when the National Vot

39

Registration Act becomes effective and puts an end to the non-voting purge (at leas[t]
elections for federal office),[0] alarming numbers of voters will emerge from prior
residences or the grave to defile the integrity of Philadelphia elections.  In a ma[tter of]
months, purging will cease.  Elections, presumably, will not.  At oral argument, th[e City]
stated that it had every intention of complying with the new law.  Apparently,
Philadelphia believes that starting next year, it will somehow manage without the p[urge]
statute that the majority finds it needs this year.[0]

The district court may not have been persuaded by the evidence that viabl[e non-]
discriminatory alternatives to purging do exist.  That, again, is its prerogative.
Moreover, before considering the question on remand, the court might properly exerc[ise its]
discretion to allow the parties to present additional evidence on this issue.  The [City]
did not do so at trial, no doubt, because it did not (and still does not) believe t[his]
question was legally relevant.

---

[0]     See 42 U.S.C.S. § 1973gg-6(b).  I discuss this legislation at greater length [at]
        infra pp. 54-57, 74 & n.40.
[0]     I do not mean to suggest that the impending effectiveness of the National Vot[er]
        Registration Act constitutes conclusive proof that the purge statute is not
        necessary. The City might be able to demonstrate that compliance will require
        financial, administrative, or informational resources that it does not presen[tly]
        possess.  The district court could properly consider such an argument on rema[nd.]

        The impending unlawfulness of purging also does not constitute a reason to ta[ke this]
        case any less seriously. First, elections will be held later this year, and a[s the]
        majority points out, the City has already begun to purge. Citizens whose
        registration is nullified will not be able to vote, and they will not be
        automatically reinstated when the practice becomes prohibited.  Second, this
        decision, like the discriminatory effects of the purge statute, is likely to [outlive]
        the statute itself.  The cessation of purging will not cure the majority's er[roneous]
        construction of § 2.

While I do not accept the plaintiffs' argument that they have "indispu[table]

established" the existence of effective, less discriminatory alternatives to the s[tatute]

they challenge, they can at least point to substantial, even uncontroverted evide[nce in]

support of that position.  The majority cannot make nearly as strong a case for [its]

unassisted finding that Philadelphia does need the non-voting purge law to prev[ent]

electoral fraud.  Unlike the majority, I do not believe that we are in any positi[on to]

decide this question.  Thus, while the purge statute may or may not be necessary, a [trial]

certainly is.    C.

To summarize, largely as a result of social and historical conditions ref[lected]

in the district court's findings, black and Latino Philadelphians vote less often.

Because they vote less often, Pennsylvania's non-voting purge law operates to remov[e]

members of these protected classes from the registration rolls at disproportionatel[y]

higher rates.  The purge law, as the majority emphasizes, is not the sole or primar[y one]

of the circumstances with which it interacts to limit the opportunity of blacks and

Latinos to vote in Philadelphia.  In my view, however, neither § 2 nor the decision[s]

construing it require the plaintiffs to make such an implausible showing, and the m[ajority]

has erred in concluding otherwise.  Finally, given the demonstrated disparate impac[t of]

the non-voting purge law, and the way in which it interacts with social and histori[cal]

conditions to deprive members of protected classes of an equal opportunity to parti[cipate]

in the political process, I would require the City to establish that the law is nec[essary]

to prevent voting fraud.  That is a question that should be left, in the first inst[ance,]

to the district court.

III.

41

Both the district court and the majority place some importance on the abi[lity of] black and Latino voters to reinstate themselves after being slated for purging, or [to] register once purged.  Neither opinion clearly spells out the legal significance of [the] possibility of reinstatement or re-registration.  The district court stated its ult[imate] conclusion as follows: "Plaintiffs have failed to demonstrate that the purge law in[teracts] with social and historical conditions to deny minority voters equal access to the political process and to elect their preferred representatives, particularly since [it is] undisputed that the purge procedure is administered fairly and that there is ample opportunity for purged voters to re-register to vote."  <u>Ortiz</u>, 824 F. Supp. at 539. [The] court further stated that "[v]oters in jeopardy of being purged who are interested [in] preserving their right to participate in the political process need only vote or re[quest] reinstatement to preserve that right."  <u>Id</u>.  The majority takes a similar position;

---

[0]  This statement reveals that the district court based its conclusion, at least [in] part, on its view of the plaintiffs' opportunity to re-register.  However, th[e court] did not make any factual findings on this subject; we do not know how many pu[rged] voters re-registered, or how many of those who did so are black or Latino. Consequently, while the opportunity to re-register undeniably exists in a pu[rely] formal sense, we do not have even the roughest measure of its practical effec[t. The] district court also did not explain why the possibility of re-registration wa[s] legally significant.  If for no other reason -- and there are other reasons -[- the] lack of factual and analytical precision, in what is otherwise an admirably t[horough] and conscientious opinion, should necessitate a remand.  In <u>Jenkins</u>, we state[d that] "[b]ecause the complexity of the proof and the importance of the issues invol[ved,] the district courts must be particularly thorough in explaining their finding[s on] both the ultimate issue of vote dilution and on their subsidiary findings as [well."] <u>Jenkins</u>, 4 F.3d at 1135 n.35.  Section 2 cases that do not involve vote dilut[ion] claims raise similarly complex and important issues and thus merit the same thoroughness.  The district court, which decided <u>Ortiz</u> before we issued <u>Jenki[ns,]</u> should be given a chance to comply with this instruction.  The remainder of i[ts] opinion demonstrates that even without our guidance, the court recognized the propriety of devoting special efforts to this type of decision.

42

view, disproportionate numbers of Latinos and blacks are purged "because they do no

and they do not take the opportunity of voting in the next election or requesting

reinstatement."  Maj. Op. Typescript at 20-21.

     As I explain above, the district court's conclusion that the non-voting p

law does not interact with social and historical conditions to deny blacks and Lati

equal access to the political process is irreconcilable with the factual findings o

it bases its decision.  Thus, in my view, that conclusion is erroneous.[0]  Moreover,

---

[0]    Because the majority is in complete agreement with the district court's legal
       reasoning, it treats the court's ultimate conclusion that no § 2 violation oc
       here as a purely factual one that we review only for clear error. Maj. Op.
       Typescript at 16 & n.8.  It is worth noting, however, that there is a substan
       legal component to § 2 decisions, and that therefore, our standard of review
       context is not as lenient as the majority opinion might suggest.  Judge Becke
       writing for the court in Jenkins, 4 F.3d 1103 (3d Cir. 1993), recently provid
       instructive (and controlling) explanation of the applicable standard of revie
       § 2 cases.  Discussing the same language in Gingles v. Thornburg on which the
       majority relies for the standard it applies, Jenkins points out that while th
       district court's factual findings are entitled to deference under Rule 52(a)'
       error standard:

       "Rule 52(a) `does not inhibit an appellate court's power to correct error
       of law, including those that may infect a so-called mixed finding of law
       fact, or a finding of fact that is predicated on a misunderstanding of th
       governing rule of law.'"  This result is clearly necessary since both the
       ultimate determination of vote dilution and the accompanying subsidiary
       determinations often depend on important legal questions.  Accordingly, w
       must subject the district court's underlying legal analysis to plenary
       review to ensure that the appropriate legal standards are applied.  As th
       [Gingles] Court concluded, it is this combination of factual deference an
       legal review that best "preserves the benefit of the trial court's
       particular familiarity with the indigenous political reality without
       endangering the rule of law."

       Jenkins, 4 F.3d at 1116-17 (quoting Gingles, 478 U.S. at 79, in turn quoting
       Corp. v. Consumers Union, 466 U.S. 485, 501 (1984)).  While the majority may
       disagree with the more complex standard of review we described in Jenkins, it

43

plaintiffs' ability to reinstate or re-register themselves after being purged does

cure the deprivation of equality that unlawfully results from the law's interaction

the totality of the circumstances.  A functional view of the political process, inf

by a searching evaluation of past and present reality, reveals that for members of

and language minority groups, neither reinstatement nor re-registration is an

insignificant barrier to participation. The majority's suggestion to the contrary f

from its formalistic understanding of political opportunity and its failure to cons

the reality that Congress instructs us to consult in evaluating the legality of cha

voting laws under § 2.

Interestingly, the majority contrasts Pennsylvania's non-voting purge law

some better-known measures that states and localities have employed with the purpos

effect of disenfranchising minority voters.  It points out, for example, that unlik

"`race-neutral' literacy tests," the purge law is not the type of device "which

discriminates against minorities, which has no rational basis, and which is beyond

control of minority voters."  Maj. Op. Typescript at 19.  But really, what would

distinguish a § 2 challenge brought against a facially neutral and evenly applied l

test, which had been adopted to further a state's legitimate interest in ensuring

participation by a minimally informed electorate, from a § 2 challenge such as the

opinion does not fully convey the significance of the legal component of § 2
decisions.

I do not take issue with any of the subsidiary factual findings the district
made in this case.  In my view, however, as I have stated, those findings can
reconciled with its ultimate conclusion that no § 2 violation occurred.  My
disagreement with the district court, therefore, strikes me as more legal tha
factual. In any event, my position does not depend on the applicable standard
review.

44

plaintiffs have brought here?[0] Surely, members of protected classes can take the

opportunity to learn to read (English). Surely, the literacy test itself would not

fault if they failed to do so. The state would not have prevented such plaintiffs

voting. Rather, under the majority's reasoning, the legally permissible explanatio

the literacy test's disparate impact would be that minority citizens learn to read

statistically lower rate than white voters. Literacy, after all, like filing a writ

Request for Reinstatement or a voter registration form, is not "beyond the control

minority voters." In fact, reinstatement and re-registration require literacy, al

other skills and resources; without the ability to read, an individual will not eve

that he or she has been slated for purging, let alone be able to respond to such a

by reinstatement or re-registration. So what makes a well-intentioned, evenly appl

and race-neutral literacy test objectionable under § 2, as the majority seems to ag

is, while a device like Pennsylvania's non-voting purge law has no trouble passing

scrutiny? Why does one measure unlawfully discriminate against minorities, while t

other does not? The majority does not suggest an answer to these questions, and I

imagine one.[0]

---

[0]     I am aware that § 201 of the Voting Rights Act Amendments of 1970, as amended
U.S.C. § 1973aa, specifically prohibits the use of literacy tests. Hypotheti
however, such prerequisites to voting could also be challenged under § 2.

[0]     In Gaston County, North Carolina v. United States, 395 U.S. 285 (1969), a cou
brought suit under § 4(a) of the Voting Rights Act seeking to reinstate a lit
test that it had formerly used as a prerequisite to registration. The Supreme
held that even if the test was administered in a fair and impartial manner, i
not be permissible. Gaston County, 395 U.S. at 296. In the Court's view, th
County had failed to disprove that "use of its literacy test, coupled with it
racially segregated and unequal school system, discriminatorily deprived Negr
the franchise." Id. at 293. Of course, as the brief history of segregation
educational inequality set forth in the Court's opinion made clear, 395 U.S.
96, the literacy test was not responsible for the fact that a disproportionat

45

Of the more than 190,000 people who were slated for purging in 1991, all

whom, of course, had already taken the trouble to register in the first place, full

failed to reinstate themselves.  Reinstatement rates were consistently higher for w

voters than for blacks and Latinos.  The district court and majority opinions leave

possible impression that the 156,000 or so voters who did not object to getting pur

just lost interest in political participation. After all, nothing prevented them fr

properly filing a written Request for Reinstatement.  They had the opportunity.  Th

simply did not take it.  If these citizens had really wanted to preserve their abil

vote, surely they could and would have done so.  As the district court put it, regi

who were "interested in preserving their right to participate in the political proc

need[ed] only vote or request reinstatement to preserve that right."  <u>Ortiz</u>, 824 F.

at 539.  Mass apathy, particularly among blacks and Latinos, is the only explanatio

disinterest is not actionable under the Voting Rights Act. <u>See</u>, <u>e.g.</u>, Maj. Op. Type

at 21 (relying on <u>Salas</u> for the proposition that members of a protected class are n

entitled to relief under § 2 merely because they vote less often).  As the City sta

its brief, the "extra effort" required to reinstate or re-register oneself "is enti

the result of the apathy of individual voters."  Appellee's Brief at 42.

Viewed formalistically, the task of filing a written Request for Reinstat

with the Voter Registration Division of the City Commissioners Office might seem li

---

percentage of the black residents of Gaston County could not pass such a test
There was no evidence of a "link," as the majority might put it, between the
challenged voting law and the plaintiffs' lack of reading skills.  Nonethele
according to the Court, that social and historical condition, "coupled with"
of even an impartially applied literacy test, resulted in a discriminatory
disenfranchisement of black citizens and therefore was not permissible under
Voting Rights Act.

46

easy thing to do.  From a more practical perspective, however, based on the reinsta[...]

statistics and a sense for past and present reality that is not diminished by troub[...]

assumptions about the behavior and motivations of black and Latino citizens, we sho[...]

know better.  See Marengo County Comm'n, 731 F.2d at 1568 ("Both Congress and the c[...]

have rejected efforts to blame reduced black participation on `apathy'.").

The record does not contain statistics showing how many voters re-registe[...]

being purged, or how many such voters are black or Latino.  We know that as a gener[...]

matter, members of minority groups register in lower percentages than whites.  At t[...]

Sandy Newman, the Executive Director of the plaintiff Project Vote, testified that [...]

organization's efforts to register minority voters, individuals attempting to fill [...]

registration forms make errors or omissions in "roughly half the cases."  A. at 93.[...]

Councilman Ortiz and his aide, Israel Colon, described the special difficulties the[...]

experienced in efforts to register Latinos, especially as a result of the language [...]

barrier. A. at 50-51, 129.  According to testimony presented by Robert Lee, the Dir[...]

of the City's Voter Registration Division, his office rejected about 8,800 of the [...]

registration forms submitted between April and October of 1992; about one out of ev[...]

twenty forms failed to make the grade.  A. at 173.  Apparently, realistically, the [...]

re-registration does, in fact, create a significant obstacle to participation, espe[...]

for members of minority groups.[0]

---

[0]    The majority believes that I have overlooked the fact that individuals cannot[...]
       purged without having already demonstrated their ability to register.  Maj. [...]
       Typescript at 24.  Registering, it points out, can be no harder the second t[...]
       around than it was the first.  Id. at 21 n.14.  I have not overlooked this po[...]
       Rather, I believe it is partly unimportant and partly untrue.

47

Any doubt that the record leaves regarding the burden of re-registration

answered by the recent passage of the National Voter Registration Act of 1993, P.L.

31, 42 U.S.C.S. §§ 1973gg et seq. (popularly known as the motor-voter law).  In

introducing the National Voter Registration Act, Congress stated its finding that

"discriminatory and unfair registration laws and procedures can have a direct and d

effect on voter participation . . . and disproportionately harm voter participation

As a general matter, doing something twice is more difficult than doing it on
Registering to vote is no exception.  Just because some black and Latino citi
have overcome obstacles to political participation and registered at some poi
the past, there is no reason to believe that they will be able to do so again
even if they continue to have the ability to register (with whatever assistar
may have received previously), the task of filing a registration form, in a p
and timely manner, remains.  Quite simply, registering twice is harder, and w
occur less frequently, than registering once.

Moreover, re-registering after being purged is different, and will often be m
difficult, than registering to begin with, because individuals who register a
later purged might not even be aware that they have lost their ability to vot
Representative Collins made exactly this point during the motor-voter law del
stating: "[I]f you are busy, as most people are, with the day to day tasks of
raising a family and working or trying to find a job or whatever else, you mi
realize that you have missed the last election and have been removed from the
registration list until it is too late."  139 Cong. Rec. H517 (daily ed. Feb.
1993) (remarks of Rep. Collins).  Once registered, would-be voters might also
reasonably believe that the City would not nullify their efforts. Indeed, as
authors of the only commentary on purge laws point out, "Purging qualified vo
who have fulfilled registration requirements will likely increase their frust
and humiliation over continued obstacles to the franchise.  Furthermore, it i
likely to deter voting by increasing alienation and apathy toward the politic
process and by intimidating qualified voters and creating a fear of encounter
election officials in the reinstatement process or at the polling place."  Ba
supra p. 34, at 523.

For the majority, the fact that purged voters have registered before means th
statute could not have violated § 2.  In my view, that fact only further
demonstrates and contributes to the statute's discriminatory effect.

48

various groups, including racial minorities." 42 U.S.C.S. § 1973gg(a)(3).  In light

that finding, and with the stated objectives of promoting the exercise of the funda

right to vote, protecting the integrity of the electoral process, and ensuring that

accurate and current voter registration rolls are maintained, Congress enacted a la

designed to increase registration rates by eliminating, to a significant extent, th

for citizens to make independent efforts to register to vote.  See 42 U.S.C.S. § 19

(providing for simultaneous driver's license and registration application).  By

drastically reducing the need for people to complete and submit separate registrati

applications, Congress hoped to "expand[] the rolls of the eligible citizens who ar

registered" and thus "give the greatest number of people the opportunity to partici

in federal elections.  H. Rep. No. 103-9, 103d Cong., 1st. Sess. 3 (1993), reprinte

1993 U.S.C.C.A.N. 105, 107.  During the debates, supporters of the bill repeatedly

expressed the view that practical and procedural obstacles, and not a lack of desir

participate, were primarily responsible for the unfortunate fact that roughly 70 mi

eligible voters in this country (about 40 percent of the voting-age population) had

to register.  E.g., 139 Cong. Rec. H488 (daily ed. Feb. 4, 1993) (remarks of Rep. N

("[T]here are 70 million eligible voters who are not registered because of the burd

registration policies and procedures which we have in this country."); id. at S2470

ed. Mar. 5, 1993) (remarks of Sen. Bradley) (stating that 40 percent of the voting-

population cannot vote "because obstacles are placed in the path of them registerin

vote.")  No legislator ever questioned the fact that the bill would substantially i

registration rates.  139 Cong. Rec. H517 (daily ed. Feb. 4, 1993) (remarks of Rep.

(opposing the bill, but acknowledging that it would increase registration).  Common

49

and the experience of states that had already adopted motor-voter mechanisms would
defeated any such suggestion.  E.g., President's Remarks on Signing the National Vc
Registration Act of 1993, 29 Weekly Comp. Pres. Doc. 914, 915 (May 20, 1993) ("The
of Washington instituted a similar measure during the 1992 election, and their motc
program registered in that state alone an additional 186,000 people."); 139 Cong. F
H495 (daily ed. Feb. 4, 1993) (remarks of Rep. Tucker) (noting experience of states
at S2390 (daily ed. Mar. 4, 1993) (remarks of Sen. Ford) (same).

Once again, in assessing the effect and legality of a challenged voting l
are supposed to maintain a practical and realistic perspective.  We are supposed to
formalistic views of what it means and what it takes to participate in political
processes.  The district court and majority opinions suggest that registering and r
registering to vote is an easy thing to do.  The way they see it, anyone who wants
register certainly can.  If that were true, if the task of filling out and submitti
application to register did not represent a substantial obstacle to political
participation, the National Voter Registration Act would not exist.  As Representat
Lewis put it: "[F]or many Americans, it is not easy to register to vote.  It is
difficult."  139 Cong. Rec. H488 (daily ed. Feb. 4, 1993).  For that reason, Congre
"an effort to make democracy a little more real for all citizens of the United Stat
Id. at H490 (remarks of Rep. McKinney).

Courts applying § 2 of the Voting Rights Act must take a similar approach
Unless we ignore Congress's instructions, divorce ourselves from past and present r
and adhere to a narrow and formalistic view of political opportunity, we will under
that the discriminatory effects of Pennsylvania's non-voting purge law are not cure

50

all alleviated by the fact that Latinos and blacks are free to reinstate themselves register after being purged from the registration rolls.

IV.

In Part III.C of its opinion, the majority devotes special attention to t district court's findings regarding the success that black and Latino candidates ha in Philadelphia elections. It reads the district court's opinion to make "an expli finding of fact that Philadelphia's minority population has not had difficulty ele minority representatives." Maj. Op. Typescript at 22. That finding, the majority to argue, precludes the plaintiffs from prevailing on their § 2 claim. The majorit committed two significant errors here. First, the district court did not make the the majority describes. Second, even if such a finding had been made, the majority misinterpreted its legal significance.

A.

1. What the District Court Did and Did Not (and Could Not) Find

Again, according to the majority, the district court "made an explicit fi that Philadelphia's minority population has not had difficulty electing minority representatives." Id. (citing Ortiz, 824 F. Supp. at 539). I disagree. The secti the district court opinion to which the majority refers is headed: "The Extent to W African-Americans and Latinos Have Been Elected to Public Office in Philadelphia." 824 F. Supp. at 537. The court's headings faithfully track the typically relevant listed in the Senate Report, which include "the extent to which members of the min group have been elected to office in the jurisdiction." Sen. Rep. at 29. According district court considered, and ultimately rejected, the plaintiffs' contention that

51

"minority candidates have experienced considerable difficulty being elected to publ[ic]

office in Philadelphia." <u>Ortiz</u>, 824 F. Supp. at 537.  In supporting this conclusi[on]

court specifically mentioned minority representation in the state legislature and o[n]

City Council.  <u>Id</u>. at 538.  Thus, the district court's discussion, as its heading

indicated, described the extent to which blacks and Latinos had been elected to off[ice in]

Philadelphia.

Somewhere in this section of the district court's opinion, the majority f[inds]

"an explicit finding of fact that the City's minority population has not had diffic[ulty]

electing minority representatives."  The district court, however, never made any fi[nding]

regarding -- and in fact, never mentioned -- the difficulty minority <u>voters</u> might h[ave]

experienced in their efforts to elect candidates; instead, in keeping with the Sena[te]

Report's instructions, it considered the extent to which black and Latino <u>candidate[s]</u>

won election to public office.  There is a substantial legal and factual difference[ ]

between the difficulty experienced by minority candidates, which the district court[ ]

considered, and the difficulty experienced by minority voters, which the district c[ourt]

neither considered nor addressed in a factual finding.[0]

---

[0]    The majority's misreading of the district court's opinion is probably a resul[t of]
       the following sentence: "The Court concludes that plaintiffs have failed to
       demonstrate that <u>minority candidates</u> experience difficulty <u>electing represent[atives</u>
       <u>to office</u>."  <u>Ortiz</u>, 824 F. Supp. at 538 (emphasis added).  Clearly, that stat[ement]
       contains a mistake.  The district court was not referring to a situation, suc[h as]
       that following a plurality vote in the electoral college, in which (successfu[l)]
       candidates for office are called upon to elect other representatives. There a[re two]
       possible ways to make sense of the district court's misstatement: either the [court]
       meant to say "voters" instead of "candidates", or it meant to say "getting el[ected]
       to office" instead of "electing representatives to office."  The first possib[ility,]
       while perhaps the one the majority would prefer, is not realistic.  The distr[ict]
       court's heading, its description and rejection of the plaintiffs' argument, i[ts]
       reliance on the Senate Report, and the content of its discussion -- in which [it]

52

If this were a vote dilution case, the plaintiffs would have had to satis[fy]
Gingles threshold factors, the third of which requires proof "that the white majori[ty]
votes sufficiently as a bloc to enable it -- in the absence of special circumstance[s]
-- usually to defeat the minority's preferred candidate." Gingles, 478 U.S. at 51. [Of]
course, this is not a vote dilution case, and I have already explained why the fact[ors]
that are most relevant in that context are of little if any relevance here. Supra [p.]
36. Assuming, however, that the plaintiffs did need to make a showing regarding th[e]
difficulty they have experienced in electing their preferred representatives -- and [as I]
discuss below, I believe the majority has erred in apparently concluding that they [did]
need to do so -- they could not rely, and a district court could not base a finding[,]
entirely on the win-loss records of minority candidates. We have not lost sight of [the]
encouraging fact that Latino and black constituents can and sometimes do prefer whi[te]
candidates, even in elections where a minority candidate is also running.[0] So, as [we]
explained in Jenkins, "[w]hile it may be tempting to assume that a minority candida[te is]
always the candidate of choice among minority voters, this is not always true." Je[nkins,]
4 F.3d at 1126; see generally id. at 1124-1131 (setting forth and applying the prop[er]
standards for determining which candidates are preferred by § 2 plaintiffs). The s[ame]

referred only to candidates who had been elected, and never to voter preferen[ces]
all point to the unmistakable conclusion that the court made a finding regard[ing the]
difficulty minority candidates had experienced in their efforts to get electe[d,]
not the difficulty minority voters had experienced in their efforts to elect [the]
candidates they supported.

[0] Conversely, and of at least equal promise, whites can and do vote for minorit[y]
candidates. The record even reveals that such laudable events may occur, as [one]
might hope, in the City of Brotherly Love; as the district court pointed out, [three]
minority members of the Philadelphia City Council were elected in at-large co[ntests]

53

of black and Latino candidates, therefore, does not necessarily prove the success o

and Latino voters.[0]

       Contrary to the majority's assertion, the district court did not find tha

minority voters had not experienced difficulty electing minority candidates; it mer

concluded that, at least as far as the plaintiffs could prove, minority candidates

experienced difficulty getting elected.[0]  We do not know which of those candidates

actually preferred by minority voters.  And even if the district court had found, a

majority claims, that minority voters experienced no difficulty electing candidates

---

[0]      Section 2 plaintiffs bear the burden of establishing which candidates they ha
preferred.  <u>Jenkins</u>, 4 F.3d at 1126. Minority voters are not entitled to an
unsupported assumption that the defeat of minority candidates, in and of itse
demonstrates the frustration of minority voting interests.  In this case, bec
the district court never considered whether black and Latino citizens had suc
in electing representatives of their choice, we do not have any of the factua
information a court would need to determine which candidates were preferred b
minority constituents.  For example, we do not know anything about the losing
candidates in elections where a black or Latino prevailed, nor do we have any
if statistical or even anecdotal evidence supports the permissible inference
minority voters in fact preferred any given minority representative.  Again,
cases (unlike this one) where such a showing is necessary, the plaintiffs mus
it. Here, however, it is the majority that equates the success of minority
candidates with the success of minority voters. That assumption is not legall
factually sound.

I am aware of the district court's finding that, as a general matter, voting
Philadelphia is racially polarized.  <u>Ortiz</u>, 824 F. Supp. at 532-33.  That fir
however, is insufficient to support a conclusion that minority voters preferr
particular minority candidates. As we pointed out in <u>Jenkins</u>, this inquiry mu
conducted "on an election-by-election basis."  <u>Jenkins</u>, 4 F.3d at 1126.

[0]      Putting aside the majority's misunderstanding of whose experience (candidates
voters') the district court was considering, it is worth noting that the cour
concluded that the plaintiffs had <u>failed to prove</u> that someone had experience
sort of political hardship. It did not, as the majority states, make an affir
finding that no one had done so.  This second inaccuracy in the majority's ve
of the district court's finding may be more subtle, but it is not insignifica

54

finding could only have been based on the unsupported and legally erroneous assumpt

that blacks and Latinos always vote for blacks and Latinos. Thus, such a finding c

not survive review.

2. The Unanswered Need to Consider Special Circumstances

Assuming that the plaintiffs' case did depend on an independent showing t

they have not been able to elect their preferred representatives (which it does not

further assuming that minority voters always prefer minority candidates (which they

not), the district court's findings still would not defeat the plaintiffs' § 2 clai

because the court never considered the kinds of "special circumstances" that might

undermine the legal significance of the minority representation it cited. Gingles

mandates that in determining whether § 2 plaintiffs have usually been prevented fr

electing their preferred candidates, courts take into account "special circumstance

as the absence of an opponent, incumbency, or the utilization of bullet voting," wh

could explain the success of minority candidates even in the face of a districting

that unlawfully diluted the plaintiffs' vote. Gingles, 478 U.S. at 57; see also Je

4 F.3d at 1119 n.9 ("consideration of special circumstances is specifically mandate

within the definition of the third Gingles factor"). As the Gingles Court took car

make clear, its "list of special circumstances is illustrative, not exclusive." Gi

478 U.S. at 57 n.26.

The uncontroverted evidence presented at trial showed that of the seven b

Latino representatives serving on the Philadelphia City Council, five were elected

"minority districts." Ortiz, 824 F. Supp. at 537; id. at 538 (acknowledging that "

the [minority] councilmembers represent wards that are highly populated by minority

55

constituents.")  The record does not reflect whether minority state legislators hav

been elected largely from districts in which black or Latino citizens constituted a

majority. Nor does it disclose whether other special circumstances, such as incumbe

the nature (or lack) of a candidate's opposition, might account for the success of

minority candidates in some instances.

It seems obvious that the existence and effect of minority districts is t

of special circumstance that courts must take into account in determining whether m

voters have experienced difficulty electing their candidates of choice.  Of course,

vote dilution context, this consideration will never arise.  Vote dilution claims

invariably challenge districting schemes that do not provide minority voters with a

effective voting majority.  A court could never learn anything about the occurrence

dilution by looking to the results of elections in districts where majority-minorit

constituencies controlled the outcome.  Outside the vote dilution context, however,

demographic composition of a district must be taken into account in assessing the e

of a challenged voting practice.  If a discriminatory law results in the

disenfranchisement of a disproportionate number of minority voters, but the remaini

voting members of the group still constitute an effective majority within a distric

plainly, the success of a minority candidate elected from that district would have

legal significance.  That result would not provide any indication whatsoever that t

challenged law had not impaired the ability of minority voters to elect their chose

representatives.  Thus, the existence of majority-minority districts is the type of

special circumstance that can explain, and thereby lessen or eliminate the signific

of, the political success enjoyed by minority-preferred candidates.

Here, the district court never considered the existence or effect of spec

circumstances such as majority-minority districts. The evidence presented at trial

the court described and at least partially credited in its opinion, would have supp

finding that these circumstances did exist. In all likelihood, the district court

had any reason to conduct this sort of inquiry, because it was only considering the

to which minority candidates had been elected to office; it was not making a findin

regarding the difficulty minority voters had experienced in trying to elect

representatives, which is entirely consistent with its conclusion that the <u>Gingles</u>

preconditions were "peripheral issues bearing little relevance" in this case. <u>Orti</u>

F. Supp. at 523. However, if the district court <u>had</u> wanted to move from its findin

minority representation on local and state governing bodies, to a conclusion that l

significant minority political success disproved the plaintiffs' claim that their a

to influence the outcome of elections had been impaired, it would have needed to co

the presence of special circumstances. A failure to do so would constitute reversi

legal error. <u>Harvell v. Ladd</u>, 958 F.2d 226, 230 (8th Cir. 1992) (reversing for fai

consider special circumstances). While the district court did not commit such erro

because of the limited nature of its findings, the majority does. It briefly descr

the electoral successes of black and Latino candidates, and concludes that those fa

refute the suggestion that the plaintiffs either have been denied fair access to th

political process or have suffered an impairment of their ability to influence the

of elections. The majority fails to acknowledge the possibility that special

circumstances could have accounted for the results on which it relies, despite the

uncontroverted evidence that such circumstances did, in fact, exist. Of course, ap

57

courts are not competent to resolve this type of question on their own, but that is

precisely what the majority would have to do in order to avoid its apparent error.[0]

## B.

Even if I accepted the majority's account of what the district court fou[nd]

would not agree with its apparent view of that finding's significance.

I confess that I am not entirely sure I understand the legal argument tha[t]

majority advances in Part III.C of its opinion.  It at least strongly intimates, ho[wever]

that the plaintiffs' failure to prove that they have experienced difficulty electin[g]

representatives, in and of itself, would preclude them from prevailing on a § 2 cla[im]

thus would provide an alternative ground for affirming the district court's decisio[n]

that is the majority's position, and if the majority is right, then any voting prac[tice]

that prevented members of protected classes from participating in the political pro[cess]

in whatever manner, to whatever extent, and for whatever reason -- would be permiss[ible]

under § 2, provided those groups could still eke out a reasonably fair share of ele[ction]

victories.  Thankfully, the Voting Rights Act allows no such thing.

---

[0] As a final point, by relying on Wilson Goode's mayoral victories in support o[f its]
position that minority voters have not had difficulty electing minority candi[dates,]
the majority has adjusted or reinterpreted the district court's findings.  Go[ode]
testified that he was the only black candidate, of the twelve who ran, to be [elected]
mayor during the past thirty years.  Thus, when the district court found subs[tantial]
minority representation in Philadelphia, it was <u>in spite</u> of Goode's success, [not]
because of it.  <u>Ortiz</u>, 824 F. Supp. at 538 ("<u>Although</u> there has been one min[ority]
mayor over the past several years, the city council . . . ." (emphasis added)[).] The
majority's use of these findings is quite different. Instead of viewing Goode['s]
mayoral victories, in their historical context, as facts that detract from bu[t do]
not defeat an argument that minority candidates have achieved substantial suc[cess in]
Philadelphia elections, the majority cites Goode's victories as only supporti[ng its]
position.

58

The majority's legal argument, one of the two sources of Part III.C's tr[ouble,] itself contains two errors. First, and most importantly, the majority has misread [the] Supreme Court's decision in Chisom v. Roemer, 115 L.Ed.2d 348 (1991). Second, it h[as] again misconstrued § 2.

According to the majority, Chisom holds that "Section 2 plaintiffs must [ ] demonstrate that they had less opportunity both (1) to participate in the political [ ] process, and to elect representatives of their choice." Maj. Op. Typescript at 21 (emphasis added); see also Maj. Op. Typescript at 23 (referring to "both elements o[f a] Section 2 claim"). Its discussion in Part III.C seems to focus on the second of th[ose] requirements; by pointing to the electoral successes enjoyed by Latino and black candidates, the majority suggests that the plaintiffs failed to prove that their ab[ility] to influence the outcome of elections --or, in other words, their ability to elect [ ] representatives of their choice -- has been impaired. Maj. Op. Typescript at 22.[0] [Because] of this purported failure, the majority concludes, the plaintiffs have "failed to s[how] both elements of a § 2 cause of action and, accordingly, [have] failed to establish [a] basis upon which [their] requested relief could be granted." Maj. Op. Typescript a[t 23.]

---

[0]    Part III.C does contain a brief reference to a district court "finding of min[imal] participation in the political process." Maj. Op. Typescript at 22 (citing Or[tiz,] 824 F. Supp. at 539). However, the "finding" the majority has in mind could [be] the district court's statement of its ultimate conclusion, where it simply ec[hoed] the language of § 2 in holding that no violation occurred. That "finding" (w[hich] appears under the heading "CONCLUSIONS OF LAW") cannot support itself. In an[y] event, once again, the majority's argument only relies on the findings regar[ding] electoral results. It is the success of minority candidates, it reasons, tha[t] demonstrates that minority voters have not been denied either fair access to [the] political process or an equal opportunity to influence the outcome of electio[ns.]

59

In the part of Chisom on which the majority relies, the Supreme Court ado

the position "that § 2 provides two distinct types of protection for minority voter

protects their opportunity `to participate in the political process' and their oppo

to elect representatives of their choice.'" Chisom, 115 L.Ed.2d at 364. The majori

the Fifth Circuit Court of Appeals, sitting *en banc*, had adopted that view in Leagu

United Latin American Citizens Council No. 4434 v. Clements, 914 F.2d 620 (5th Cir.

(*en banc*) ("LULAC"), rev'd sub nom. Houston Lawyers' Ass'n v. Attorney General of T

115 L.Ed.2d 379 (1991) (companion case to Chisom). The LULAC majority determined t

word "representatives," as used in the phrase "to elect representatives of their ch

did not include judges. Consequently, it held that § 2 plaintiffs could not challe

districting scheme that allegedly prevented them from electing the judicial candida

they preferred. However, because the word "representatives" did not limit the firs

the two distinct protections that, according to the LULAC majority, § 2 provided --

namely, the opportunity to participate in the political process -- a voting practic

procedure that compromised minority voters' opportunities to participate in judicia

elections remained subject to challenge. Chisom describes the Fifth Circuit's rati

as follows:

> [A] standard, practice, or procedure in a judicial election, such as a
> limit on the times that polls are open, which has a disparate impact
> on black voters' opportunity to cast their ballots under § 2, may be
> challenged even if a different practice that merely affects their
> opportunity to elect representatives of their choice to judicial
> office may not.

Chisom, 115 L.Ed.2d at 364. The construction of § 2 the majority appears to adopt

III.C is similar but more demanding. Like the LULAC court, it divides § 2; the oppo

to participate, in its view, is distinct from the opportunity to elect. Unlike the

60

court, however, the majority reads § 2 to contain two "elements," each of which a

plaintiff must satisfy in order to prevail, rather than two alternative "protection

thus, while the Fifth Circuit required plaintiffs to prove only one of two differer

abridgements of political opportunity, the majority here requires proof of both.

The Supreme Court rejected both majority positions --the one advanced in

and the one advanced here. According to Chisom, the Fifth Circuit had erroneously

attempted "to divide a unitary claim created by Congress." Chisom, 115 L.Ed.2d at

The majority of this panel has done precisely the same thing. However, as the Chis

Court put it, § 2 cannot be compelled to undergo the "radical surgery [that] would

required to separate the opportunity to participate from the opportunity to elect."

364. "The statute does not," the Court explained, "create two separate and distinc

rights." Id. Rather: "Any abridgement of the opportunity of members of a protected

to participate in the political process inevitably impairs their ability to influer

outcome of an election." Id. (emphasis added). As the Court had stated in White v

Register and Whitcomb v. Chavis, Chisom continues, "the opportunity to participate

opportunity to elect [are] inextricably linked." Id. at 365 (emphasis added) (citi

White, 412 U.S. at 766, and Whitcomb, 403 U.S. 124, 149 (1971)).

Thus, in Chisom, the Court clearly and repeatedly rejected the majority's

apparent view that § 2 plaintiffs must satisfy each of two distinct elements (lesse

opportunity both to participate and to elect) in order to prevail. Instead, if suc

plaintiffs can prove that a voting law has abridged their opportunity to participat

the political process -- by, for example, removing them from the registration rolls

thus effectively nullifying their franchise -- that law has also necessarily and

61

"inevitably" impaired the plaintiffs' ability to influence the outcome of an electi

Such is the nature of the "unitary claim" Congress created. Under this sensible an

supported construction of § 2, a voting practice is impermissible if it operates to

the members of a protected class of an equal opportunity to participate in the poli

process -- even if the group has managed to overcome that disadvantage and to elect

representatives of its choice.[0]

The majority does not agree. Again, looking exclusively to electoral res

it concludes that the plaintiffs cannot prevail, because there is no evidence that

purge law has denied them fair access to the political process or impaired their ab

to influence the outcome of elections. Maj. Op. Typescript at 22. This position co

based on one of several rationales, none of which are availing. Perhaps the majori

disagrees with, or has overlooked, Chisom's use of words like "inevitably" and

"inextricably linked", which describe the relationship between the abridgement of a

group's opportunity to participate in the political process, on the one hand, and t

impairment of that group's ability to elect representatives, on the other. Chisom,

L.Ed.2d at 364. The majority would apparently require the plaintiffs to produce ev

of a connection that, at least according to Chisom, necessarily exists as a matter

[0]      This is not the way Justice Scalia read the Court's opinion. In fact, Justic
         Scalia criticized the Chisom majority for construing § 2 in such a way that m
         of a minority group that was not large enough to control the outcome of elect
         but who nonetheless had suffered an abridgement of their opportunity to parti
         in the political process, would not be protected. Chisom, 115 L.Ed.2d at 372
         (Scalia, J. dissenting). The Chisom majority, however, expressly rejected th
         interpretation of its opinion. Id. at 365 n.24. Thus, regardless of whether
         Justice Scalia's criticism had merit, not one member of the Court was willing
         adopt a construction of § 2 under which a measure that operated to abridge a
         opportunity to participate, but that did not itself prevent that group from e
         representatives, would be permissible.

62

and logic.  Alternatively, the majority might believe that by purging people from t

registration rolls, the City has not in any way lessened their opportunity to parti

in the political process.  But I would hope we could agree about this much: when

individuals are purged, they cannot vote; if they cannot vote, their opportunity to

participate is diminished; and, once again, according to the Supreme Court, if thei

opportunity to participate is diminished, their ability to elect their preferred

representatives is necessarily, "inevitably" impaired. A final possibility remains.

majority might simply be restating, in a somewhat oblique way, its view that in ord

establish a violation of § 2, the plaintiffs would have had to establish that the p

law itself operates to prevent Latinos and blacks from voting and that, therefore,

is entirely responsible for its discriminatory effect.  If that is the majority's p

however, then the argument advanced in Part III.C would not provide any additional

for its conclusion, and thus would not require a response.

In arguing that the plaintiffs' failure to prove difficulty electing

representatives defeats their claim, the majority not only misreads Chisom; it also

again, misreads § 2.  The district court, in contrast, recognized that the success

and Latino candidates have had in winning public office is merely one factor among

that are relevant in a § 2 inquiry.  As § 2(b) quite plainly states: "The extent to

members of a protected class have been elected to office in the State or political

subdivision is one circumstance which may be considered."  42 U.S.C. § 1973(b) (emp

added).[0] According to the majority's apparent view, however, that circumstance is s

---

[0]     As I state above, supra p. 36, the extent to which minority voters have exper
        difficulty electing candidates of their choice -- and thus relatedly, the ext
        which minority candidates have won election to office -- is one relevant fact

63

dispositive. Maj. Op. Typescript at 22-23. Congress disagrees. Sen. Rep. at 29 n

(rejecting the notion that a failure "to establish any particular factor" defeats a

claim). The Supreme Court disagrees. See Gingles, 478 U.S. at 45 (recognizing tha

particular number of factors need be proved, but that § 2 analysis instead depends

searching practical evaluation of past and present reality and on a functional view

political process). I disagree as well.

V.

Congress, in its continued efforts to ensure that the democratic processe

occurring in this country will be equally open to members of racial and language

minorities, has had the good sense to prohibit non-voting purges in federal electio

legislation it recently enacted to eliminate "discriminatory and unfair registratio

does not overlook laws such as the one the plaintiffs have challenged in this case.

when the National Voter Registration Act becomes effective, Pennsylvania will no lo

able to remove individuals from the registration rolls because of their failure to

See 42 U.S.C.S. § 1973gg-6(b)(2).[0] As I stated at the outset, however, I am concer

among others, that a court can take into account in assessing the effect and
legality of a non-voting purge law. Political success could well encourage
participation, while repeated failure could lead to disillusionment, alienati
the belief that voting is pointless. Therefore, because this factor might i
minority participation rates, it is a relevant consideration in a challenge t
that disenfranchises those who fail to vote. The extent of a group's politic
success, however, while relevant, is not of central importance among the
circumstances that affect its members' inclination or ability to participate,
certainly not anything approaching a threshold or essential factor that § 2
plaintiffs must establish in order to successfully challenge a non-voting pur

[0]The statute provides:

> Any State program or activity to protect the integrity of the
> electoral process by ensuring the maintenance of an accurate and
> current voter registration roll for elections for Federal office . . .

64

that today's decision will reach beyond its context and misdirect future efforts to properly apply the Voting Rights Act.

The majority makes a valid and important observation: the law, in various has indeed "sought to raze any enduring bastions of state-administered voting discrimination."  Maj. Op. Typescript at 18-19.  We cannot discount the achievement separates Philadelphia, Mississippi in 1964 from Philadelphia, Pennsylvania in 1994 However, the goal the majority describes, and in which it undoubtedly believes, has been attained. Even after Congress's most recent contribution to the cause of equal political opportunity, discrimination in voting remains.  A proper application of t Voting Rights Act in this case would have resulted in precisely the kind of additio progress the Act was intended to bring about.

According to the majority, the right to vote, "the very essence of democr society," has now been "extended to every American citizen, without regard to race ."  Maj. Op. Typescript at 18.  That accomplishment loses meaning, however, when discriminatory voting laws make the right to vote harder for some to exercise than When such discrimination occurs, I fear that today's decision will make it more dif for us to respond in the way the law requires.  To borrow a phrase from a particula meaningful source, there is "unfinished work" to be done before we achieve the equa

shall not result in the removal of any person from the official list of voters registered to vote in an election for Federal office by reason of the person's failure to vote.

42 U.S.C.S. § 1973gg-6(b).  Theoretically, states and localities could creativ struggle to avoid this mandate by maintaining separate registration rolls for elections.  At oral argument, the City stated that it had no intention of maki a determined and impractical effort to preserve, as best it can, the non-votir law.

mandated by § 2 of the Voting Rights Act.[0]  Because this case demonstrates that fac

respectfully dissent.

---

[0]    See Abraham Lincoln, Address at Gettysburg, Pennsylvania (Nov. 19, 1863), in
Abraham Lincoln: Speeches and Writings 536 (Don E. Fehrenbacher, ed., 1989).
Appropriately, the "unfinished work" to which Lincoln referred was the preser
of democratic government. The debates preceding the enactment of the most rec
voting rights legislation show that Lincoln continues to inform our ideals ab
political participation.  E.g., 139 Cong. Rec. S2471 (daily ed. Mar. 5, 1993)
(remarks of Sen. Bradley); id. at H506 (daily ed. Feb. 4, 1993) (remarks of F
Thomas).